**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF<br>NEW HAMPSHIRE, et al | \* | |
| | \* | |
| | \* | |
| Plaintiffs, | \* | |
| v. | \* | Civil No. 1:20-cv-00688-JL |
| | \* | |
| GOVERNOR CHRISTOPHER T.<br>SUNUNU, Governor of the State of<br>New Hampshire, in his official capacity, | \* | |
| | \* | |
| | \* | |
| | \* | |
| and | \* | |
| | \* | |
| WILLIAM M. GARDNER, Secretary of<br>State of the State of New Hampshire,<br>in his official capacity, | \* | |
| | \* | |
| | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF LAW IN SUPPORT OF THE DEFENDANTS' OBJECTION TO PLAINTIFFS' EMERGENCY VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Governor Christopher T. Sununu, in his official capacity as Governor of the State of New Hampshire ("Governor") and William M. Gardner, in his official capacity as Secretary of State for the State of New Hampshire ("Secretary of State") (collectively "State"), by and through their counsel, the New Hampshire Office of the Attorney General, submit this memorandum of law in support of the objection to the plaintiffs' motion for temporary restraining order and preliminary injunction filed herewith.

# INTRODUCTION

The plaintiffs challenge the constitutionality of N.H. Rev. Stat. Ann. § 655:40 and N.H. Rev. Stat. Ann. § 655:42 as applied to the Libertarian Party of New Hampshire ("LPNH") and its candidates during the 2020 General Election. The plaintiffs claim that enforcing the statutes' requirements that, within a seven month period, they gather signatures on and submit nomination papers of either 1,500 or 3,000 registered voters to secure a place on the ballot violates their rights under the First Amendment. Alleging an inability to collect the requisite number of nomination papers in light of the COVID-19 pandemic, the plaintiffs seek a preliminary injunction requiring the Secretary of State to "place the [p]laintiffs on the New Hampshire November 3, 2020 general election ballot . . . ." Doc[1] 4-3.

The plaintiffs are not entitled to preliminary injunctive relief. As explained below, they have failed to meet their burden as to any of the factors courts consider when determining whether to issue a preliminary injunction. It is well established that the State's interest in requiring some preliminary showing of a significant modicum of support before printing the name of a candidate on the ballot sufficiently justifies the reasonable, nondiscriminatory restrictions placed upon the plaintiff's rights by the State's ballot access laws. *Libertarian Party of New Hampshire, v. State*, 154 N.H. 376 (2006); *see also Libertarian Party of New Hampshire v. Gardner*, 843 F.3d 2d 20 (1st Cir. 2016) (upholding constitutionality of New Hampshire's regulations relative to nomination of a political organization by nomination papers).

The plaintiffs fail to demonstrate that applying these facially constitutional laws during the 2020 General Election would impose a severe burden on their ability to access the ballot in light of the COVID-19 pandemic; to the contrary, they largely created their own burden. As

---

[1] "Doc __:___" refers to this Court's document and page number.

described below, the plaintiffs did little to nothing to gather any signatures between January 1, 2020, when candidates could begin collecting signatures, until mid-March, 2020, when the Governor declared a state of emergency. Between late March, 2020 and June 8, 2020, when the Governor's "Stay at Home" Order was in effect, the plaintiffs failed to explore alternatives to in person canvassing, or file suit to assert the claims they now make. As of June 15, 2020, the Stay at Home Order has expired and the plaintiffs are free to begin signature gathering efforts. To the extent they now face a time crunch, it is of their own making and not the result of a severe burden on their ballot access.

For the same reason, the plaintiffs similarly cannot demonstrate any risk of irreparable harm, at least none caused by anyone but them. And they fail to demonstrate any reason why the public interest in orderly election processes and uncluttered ballots somehow favors their request to appear on the ballot with no indication of any, much less a significant modicum, of support.

# BACKGROUND

## I.    NEW HAMPSHIRE'S BALLOT ACCESS LAWS

Similar to most states, New Hampshire has long required political candidates seeking to have their names listed on statewide election ballots to first demonstrate a significant modicum of support among registered voters.  To that end, New Hampshire law provides a potential candidate with three avenues for placement on the general election ballot:  (1) as the nominee chosen in the primary of a state recognized "party"[2]; (2) as the nominee of a state recognized "political organization"[3]; and (3) by submitting, as an individual candidate, the requisite number of nomination papers.[4]  *See Libertarian Party v. Gardner*, 638 F.3d 6, 10 (1st Cir. 2011); *see also Libertarian Party of New Hampshire v. State*, 154 N.H. 376, 378-79 (2006) (describing New Hampshire's statutory scheme for ballot qualification).

LPNH does not have a significant modicum of support among registered voters in New Hampshire to qualify as either a party or a political organization; therefore, its candidates seek access to the 2020 ballot as individual candidates.  N.H. Rev. Stat. Ann. § 655:40 provides,

> As an alternative to nomination by party primary, a candidate may have his or her name placed on the ballot for the state general election by submitting the requisite number of nomination papers. Such papers shall contain the name and domicile of the candidate, the office for which the candidate is nominated, and the political organization or principles the candidate represents. Nomination papers shall be signed by such persons only as are registered to vote at the state general election. No voter shall sign more than one nomination paper for each office to be voted for,

---

[2] "Party" is defined as "any political organization which at the preceding state general election received at least 4 percent of the total number of votes cast for any one of the following:  the office of governor or the offices of United States Senators."  N.H. Rev. Stat. Ann. § 652:11.

[3] To constitute a state recognized "political organization" and have its name placed on the general election ballot, a political organization must submit nomination papers signed by at least 3 percent of the total votes cast at the previous state general election.  N.H. Rev. Stat. Ann. § 655:40-a; N.H. Rev. Stat. Ann. § 655:42, III.

[4] A candidate who is not nominated by a state recognized party or political organization must submit nomination papers signed by at least 3,000 registered voters to be nominated as a candidate for president, United States senator, or governor, *see* N.H. Rev. Stat. Ann. § 655:40, N.H. Rev. Stat. Ann. § 655:42, I, and at least 1,500 registered voters to be nominated as a candidate for United States representative, 750 for councilor or state senator, and 150 for state representative or county officer, *see* N.H. Rev. Stat. Ann. § 655:40, :42, II.

and no nomination paper shall contain the names of more candidates than there are offices to be filled. Each voter shall sign and date an individual nomination paper. Nomination papers shall be dated in the year of the election.

N.H. Rev. Stat. Ann. § 655:42, which governs the number of nomination papers a candidate must submit, states:

> I. It shall require the names of 3,000 registered voters, 1,500 from each United States congressional district in the state, to nominate by nomination papers a candidate for president, United States senator, or governor.

> II. It shall require the names of 1,500 voters registered in the district to nominate by nomination papers a candidate for United States representative; 750 to nominate a candidate for councilor or state senator; and 150 to nominate a candidate for state representative or county officer.

Valid nomination papers must meet certain statutory requirements. First, they must be signed and dated in the year of the election by "such persons only as are registered to vote at the state general election." N.H. Rev. Stat. Ann. § 655:40. Second, once collected, each nomination paper must be "submitted to the supervisors of the checklist of the town or ward in which the signer is domiciled or registered" for a certification as to "whether or not the signer is a registered voter in said town or ward." N.H. Rev. Stat. Ann. § 655:41, I. The nomination papers must be "submitted to the supervisors of the checklist no later than 5:00 p.m. on the Wednesday 5 weeks before the primary," and the supervisors are required to complete the certification process "no later than 5:00 p.m. on the Wednesday 2 weeks before the primary." *Id.* New Hampshire holds its primary "on the second Tuesday in September in every even-numbered year." N.H. Rev. Stat. Ann. § 653:8. As a result of these statutory requirements, a candidate has from January through July of an election year, approximately seven months (or 210 days), in which to collect nomination papers.

The New Hampshire primary for the 2020 General Election will occur on September 8, 2020, as a result of which the deadline to submit nomination papers to the supervisors of the

checklist is August 5, 2020.  *See* NH Political Calendar 2020-2021, *available at* http://sos.nh.gov/.  The Secretary of State will not be able to prepare and deliver the ballots, as required by N.H. Rev. Stat. Ann. § 656:1, until the results of the primary are known, sometime after the September 8, 2020 Primary.


## II.    THE PLAINTIFFS' LACK OF EFFORT TO OBTAIN SIGNATURES IN 2020

On January 1, 2020—almost three months before the Governor issued his first Stay at Home Order on March 26, 2020—the time period for gathering nomination signatures commenced.  *See* N.H. Rev. Stat. Ann. § 655:40 (requiring that nomination papers "be dated in the year of the election").  The record reflects that the plaintiffs deliberately made no effort to gather signatures during the winter months.  *See* Doc 1:5 ¶ 21 ("For the year 2020, Plaintiffs' planned to concentrate their solicitation activities during the Spring and Summer when the weather was more conducive to in-person solicitations, and after the Libertarian Party's national convention" in May); *see also* Doc 4-1: 2¶ 7.  The plaintiffs idled away the first quarter of 2020 even though, just five years ago, the LPNH took the position in this Court that it needed a full 21 months in which to gather signatures, and that cutting that period down to just seven months would violate its First Amendment rights.  *See Libertarian Party*, 126 F.Supp. 3d at 200-01; *Libertarian Party*, 843 F.3d at 26-7.  In any event, the plaintiffs' willingness to let the first quarter of 2020 pass without mustering any signature gathering efforts tacitly concedes that they need no more than four to five months in which to gather their signatures.  But LPNH's past history suggests that they need less time than that:  in 2012, for example, LPNH

obtained over 13,000 signatures in just two months. *Libertarian Party*, 843 F.3d at 23 (describing LPNH's 2012 signature efforts and success).

By failing to commence efforts in January, the plaintiffs missed prime opportunities to gather signatures. *See id.* at 27 (rejecting LPNH's argument that it is difficult to obtain signatures during winter months, noting that "hundreds of thousands of New Hampshire citizens streamed in and out of polling stations in the presidential primaries held [in] February"). First, the Governor did not declare a state of emergency until well into March 2020, leaving the plaintiffs with over two months – half of the time they apparently believe they need – in which to gather signatures. *See* Doc 4-1:2 ¶ 7 (describing deliberate plans not to conduct signature gathering efforts until the spring, leaving themselves four to five months in which to gather the necessary signatures).

Second, on February 11, 2020, prior to the state of emergency, New Hampshire conducted a Presidential Primary at which 152,554 Republican and 279,749 Democratic voters cast ballots in person. *See* Ballots Cast, *available at* http://sos.nh.gov/nhsos_content.aspx?id=8589996918. These 432,303 New Hampshire voters all spent time that day at one of the 309 polling places in the State. The plaintiffs deliberately declined to deploy supporters to these polling places, where they could have gathered countless signatures from voters exiting various polling locations. *See Libertarian Party*, 843 F.3d at 27 (observing "[o]f course, hundreds of thousands of New Hampshire citizens streamed in an out of polling stations in the presidential primaries held [in] . . . February," as example of opportunity for winter signature gathering).

Third, on Tuesday, March 10, 2020, also before the state of emergency, most towns in New Hampshire conducted their annual election. *See* NH Political Calendar 2020-2021,

*available at* http://sos.nh.gov/.  Significant numbers of voters also participated in that election and were at polling places during the course of the day where the plaintiffs could have deployed supporters to collect signatures.  *Libertarian Party*, 843 F.3d at 29 (observing that "New Hampshire traditionally holds town meetings in the spring . . . .").

Both the Presidential Primary and town elections occurred prior to the Governor declaring a State of Emergency due to the COVID-19 pandemic.  Each, alone, would have provided the plaintiffs an opportunity to gather their full statutory complement of signatures.  Given the volumes of registered voters concentrated at polling locations within a month of one another in February and March, the plaintiffs deliberately missed their opportunity to gather their statutory requirement of signatures before the pandemic even took hold.

## III.    THE COVID-19 STATE OF EMERGENCY

On March 13, 2020, the Governor exercised his emergency powers under N.H. Rev. Stat. Ann. § 4:45 and issued Executive Order 2020-04, declaring a State of Emergency due to Novel Coronavirus (COVID-19) in New Hampshire.  Upon the expiration of that order, and the expiration of each extension order issued thereafter, the Governor extended the State of Emergency through June 26, 2020.  *See* Executive Orders 2020-08, 2020-09, and 2020-10.[5] Since the declaration of the State of Emergency, the Governor has issued a number of Emergency Orders in response to the COVID-19 crisis.

Relevant to this action, on March 23, 2020, the Governor issued Emergency Order #16, prohibiting scheduled gatherings of ten or more attendees.  On March 26, 2020, the Governor

---

[5] All of the Governor's Executive Orders and Emergency Orders issued thereunder are available online at https://www.governor.nh.gov/news-and-media/emergency-orders-2020.

issued Emergency Order #17, closing non-essential businesses and requiring New Hampshire residents to stay at home unless engaging in certain identified activities (commonly referred to as the Stay at Home Order).

Those emergency orders remained in place, in some form, through June 15, 2020. During that two and a half month period, however, the plaintiffs again declined to take any action. Following the Governor's declaration of a state of emergency and the issuance of the Stay at Home Order in late March, the plaintiffs "concluded that normal solicitation activities would be inconsistent with the Governor's orders, and put the safety of solicitors and voters at risk." Doc 1:3 ¶ 8. Rather than try to solicit nomination papers by telephone, mail, online efforts, or otherwise, the plaintiffs apparently made no attempt to solicit signatures by any means following the declaration of the State of Emergency. *See* Doc 1:6 ¶ 30 ("Plaintiffs do not believe, based upon their experience, that solicitations by phone or email would be practical or cost effective.").[6] The plaintiffs, meanwhile, took no action until June 8, 2020, when they filed this action, to challenge the Stay at Home Order as applied to them. As with the first quarter of 2020, during the period of March 13, 2020 through June 8, 2020, the plaintiffs remained idle.

What is more, by early May—only a little more than a month after the Stay at Home Order issued—New Hampshire was already beginning to reopen. As the first step in "reopening the economy," on May 1, 2020, the Governor issued Emergency Order #40—also known as "Stay at Home 2.0," which began the process of permitting businesses that had been deemed

---

[6] While Jilletta Jarvis, Secretary for LPNH, states in her Affidavit that the "efforts we have . . . made to secure signatures through on-line or telephone solicitations have been unsuccessful, and have required the allocation of a disproportionate amount of resources," she does not state that those efforts were made during this signature gathering period. Doc 4-1:2 ¶ 5; *see also* Doc 4-1:2 ¶ 6 (beginning with the phrase "[i]n our experience," suggesting that she is referring to past efforts). Read in conjunction with Paragraph 30 of the Amended Complaint, Ms. Jarvis's statements do not appear to refer to any efforts made by LPNH to gather signatures by telephone, online, or otherwise during 2020. *See* Doc 2;6, ¶ 30.

"non-essential" to reopen in a limited manner and under guidelines designed to minimize the adverse impact on public health. This even included businesses that provide social gathering activity, such as restaurants, and other public attractions such as beaches. On May 29, 2020, the Governor extended the Stay at Home Order through June 15, 2020.

On June 15, 2020, both the Stay at Home Order and Emergency Order #16 (prohibiting gatherings of ten or more attendees) expired. Since then, the record reflects that the plaintiffs filed this action, but otherwise have not made any attempts to gather the necessary signatures, beyond advertising on June 27, 2020 for volunteers to help gather signatures. *See* https://lpnh.org/2019/07/04/lpnh-announces-2020-presidential-preference-primary/ last visited July 1, 2020). The Jarvis affidavit serves as the sole evidence before this Court concerning the plaintiffs' conduct in 2020. Doc 4-1.

Despite the Stay at Home Order and social distancing guidelines, there recently have been several large gatherings of politically active people in public spaces—a perfect opportunity for signature gathering. Public authorities, notwithstanding the emergency orders, effectively sanctioned these gatherings. The plaintiffs could have deployed supporters to those gatherings to solicit nominating papers, but apparently they disregarded those opportunities as well. The plaintiffs themselves, moreover, have scheduled a number of "Libertarian meetups" to occur throughout July. *See* https://lpnh.org/find-events/

With the expiration of the Stay at Home Order, nothing prevents the plaintiffs from gathering signatures from now until the submission deadline on August 5, 2020. They simply haven't tried.

## IV.   THE PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION.

On June 8, 2020, the plaintiffs filed the instant action.  Doc 1.  On June 9, 2020, the plaintiffs filed an amended complaint, Doc 2, as well as an Emergency Verified Motion for Temporary Restraining Order and Preliminary Injunction with supporting memorandum of law and proposed order, Doc. 4-2, Doc 4-3.  Through the motion, the plaintiffs seek a preliminary injunction requiring the Secretary of State to "place the [p]laintiffs on the New Hampshire November 3, 2020 general election ballot . . . ."  Doc 4-3.

## STANDARD OF REVIEW

"A preliminary injunction is an 'extraordinary and drastic remedy,'" which "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). The party seeking one bears the burden of establishing that the following four factors weigh in its favor: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). "The *sine qua non* of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). As to the second factor, irreparable harm does not exist where the moving party has an adequate remedy at law. *See Aoki Technical Laboratory, Inc. v. FMT Corp.*, 26 F. Supp. 2d 319, 331 (D.N.H. 1998).

Moreover, the plaintiffs do not request preliminary injunctive relief to preserve the status quo. Instead, they ask this Court to order the Secretary of State to place their names on the 2020 General Election ballot. Such a request amounts to a *mandatory* preliminary injunction. *See Braintree Labs., Inc. v. Citigroup Global Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (A mandatory preliminary injunction "requires affirmative action by the non-moving party in advance of trial."). "Because a mandatory preliminary injunction alters rather than preserves the status quo, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'" *Id.* (quoting *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)); *see also South Bay United*, 590 U.S. ___ slip op. at 1-2 ("This power is used where the legal rights at issue are indisputably clear and, even

then, sparingly and only in the most critical and exigent circumstances.") (quotation and citation omitted). The plaintiffs fail to meet this heavy burden and neither their amended complaint nor their motion reveal any exigencies that demand the issuance of mandatory preliminary injunctive relief.

**ARGUMENT**

**I.  THE PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.**

In the First Circuit, "proving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." *Arborjet, Inc.*, 794 F.3d at 173 (citations omitted). "If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Id.* (bracketing and citations omitted). "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success—rather, they must establish a strong likelihood that they will ultimately prevail." *Sandicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F3d. 1, 10 (1st Cir. 2012) (citations and internal quotation marks omitted).

The plaintiffs claim that enforcing New Hampshire's statutory ballot access requirements during the 2020 General Election would place a severe and unconstitutional burden on their First Amendment rights.  The plaintiffs are not likely to succeed on the merits of this claim because they cannot demonstrate that the combination of the State's ballot access laws and the conditions of the COVID-19 pandemic have imposed a severe burden on their ability to obtain signatures, when viewed in light of the entire time period available to the plaintiffs for gathering nomination papers.

**A.  Application of N.H. Rev. Stat. Ann. § 655:40 and N.H. Rev. Stat. Ann. § 655:42 during the 2020 General Election imposes only a reasonable burden on ballot access that is outweighed by the State's interest in avoiding ballot clutter.**

State-enacted ballot-access regulations "implicate 'two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes

effectively,' thereby triggering scrutiny under both the First and Fourteenth Amendments."
*Libertarian Party of N.H.*, 843 F.3d at 25 (quoting *William v. Rhodes*, 393 U.S. 23 (1968)).
Those rights, however, "are necessarily subject to qualification if elections are to be run fairly
and effectively." *Cool Moose Party v. Rhode Island*, 183 F.3d 80, 82 (1st Cir. 1999) (quoting
*Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)). "[A]s a practical matter, there
must be a substantial regulation of elections if they are to be fair and honest and if some sort of
order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S.
724, 730 (1974). "'This legitimate interest in reasonable regulation is based not only on
'common sense,' *Burdick v. Takushi*, 504 U.S. 428, [433 (1992)], but also the [U.S.
Constitution's] Article I reservation to the States of the power to prescribe 'Times, Places and
Manner of holding Elections for Senators and Representatives.' U.S. Const., Art. I, § 4, cl. 1.'"
*Libertarian Party of N.H. v. Gardner*, 126 F. Supp. 3d 194, 199 (D.N.H. 2015) (quoting
*Libertarian Party of Maine v. Diamond*, 992 F.2d 365, 370 (1st Cir. 1993)).

"In recognition of the competing interests at stake where ballot access regulations are
concerned, the Supreme Court has developed a flexible 'sliding scale' approach for assessing the
constitutionality of such restrictions." *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010). Under
this approach, "a restriction that imposes a severe burden on ballot access cannot survive unless
it is narrowly drawn to advance a state interest of compelling importance. In contrast,
restrictions that impose reasonable and nondiscriminatory burdens on ballot access require only a
corresponding state interest sufficiently weighty to justify the limitation." *Libertarian Party of
N.H.*, 126 F. Supp. 3d at 200 (brackets and citations omitted); *see Anderson v. Celebrezze*, 460
U.S. 780, 789 (1983). Determining the nature of the burden, therefore, drives the analysis of the
constitutional claim against the restriction.

The plaintiffs do not challenge the facial validity of N.H. Rev. Stat. Ann. § 655:40 and N.H. Rev. Stat. Ann. § 655:42, nor could they. New Hampshire's requirements on the plaintiff candidates – 3,500 or 1,500 signatures – fall well below what is constitutionally onerous. *See Libertarian Party of N.H.*, 843 F.3d 2d 20 (upholding constitutionality of New Hampshire's ballot-access regulations relative to political organizations, concluding that the regulations have "a cumulative burden well less than that found acceptable in controlling precedent"); *Libertarian Party of N.H.*, 154 N.H. 376 (upholding the constitutionality of New Hampshire's ballot-access laws, concluding that they impose only a reasonable burden on a party or candidate's ability to access the ballot and are reasonably related to the state's interests in maintaining an orderly ballot). Instead, the plaintiffs claim that the statutes are unconstitutional as applied to them during the 2020 General Election because of the COVID-19 pandemic.

The plaintiffs cannot establish a likelihood of success on the merits because they do not face a severe burden on their access to the ballot, and the State has a well-established interest in the reasonable burden the signature requirements impose. *See Libertarian Party of N.H.*, 843 F.3d 2d 20; *Libertarian Party of N.H.*, 154 N.H. 376. For the reasons discussed below, the Court should find that N.H. Rev. Stat. Ann. § 655:40 and N.H. Rev. Stat. Ann. § 655:42 as applied to the 2020 General Election impose only a reasonable and nondiscriminatory burden on the plaintiffs' ability to access the ballot, which is outweighed by the State's strong interest in preventing ballot clutter by requiring candidates to make a preliminary showing of substantial support. The plaintiffs are not entitled to a preliminary injunction.

**1.    The current State of Emergency has not transformed the State's reasonable ballot-access process into a severe burden on the plaintiffs.**

At the outset, the plaintiffs' challenge appears more aimed at bygone emergency orders they belatedly challenge than the statute itself.  To that end, the plaintiffs argue that, as applied to the 2020 General Election, the State's ballot-access regulations impose a severe burden because the Governor's Orders and social distancing guidelines relating to the COVID-19 pandemic have affected their ability to gather nomination papers.  Doc 1:5 ¶¶21-28.  But the plaintiffs had nearly three months in the beginning of the year in which no state of emergency existed at all.  They purposefully declined to undertake any signature gathering on their unquantified sense that they would not be successful during the winter months.  Doc 4-1:2 ¶7 ("For this election cycle, it had been our intention to focus our solicitation activities during the spring and summer when the weather would be conducive to in-person solicitations.").  This is not the first time that LPNH has asserted that it cannot effectively gather signatures in the winter:  both this Court and the First Circuit have squarely rejected the notion that New Hampshire residents "hibernate" all winter, and have emphasized, to the contrary, that hundreds of thousands of New Hampshire voters "stream" to and from polling places during the presidential primary.  *Libertarian Party*, 843 F.3d at 27 ("[W]ith New Hampshire voters turning out in droves for party primaries in February, we doubt New Hampshire citizens hibernate as much as LPNH implies."); *Libertarian Party*, 126 F.Supp.3d at 202 ("LPNH's own experience during its 2012 petition drive establishes that it is not impossible to collect petitions at all during the winter," and noting that LPNH collected over 1000 signatures in December, 2011.).

The opportunity the presidential primary presented bears emphasis.  As mentioned above, 432,303 New Hampshire voters all spent time at one of the 309 polling places in the State on February 11, 2020.  If just 300 LPNH supporters or paid petitioners joined the effort, each person

would have had to obtain only ten signed nomination papers for the plaintiffs who are seeking the highest offices, and only five or less for those seeking offices requiring smaller numbers of nomination papers.  Even if LPNH had only 150 supporters and targeted polling places with higher numbers of voters, each would have had to gather at most twenty signed nominating papers.  If LPNH is unable to muster 150 supporters, that may reflect its candidates' level of support and their entitlement to a position on the general election ballot.

During the period from March 26, 2020 through June 15, 2020, the Governor's Stay at Home and related emergency orders were in effect.  Rather than try to make up for lost time over the winter, the plaintiffs again sat idle.  It was not until June 8, 2020 that the plaintiffs filed this action.  During that same time, moreover, the plaintiffs did not even explore alternatives to in person canvassing, such as electronic mail, telephonic or other solicitation.  The plaintiffs let nearly two and a half more months elapse without taking any action to assert their rights.

As of June 15, 2020, the Stay at Home Order has expired, and the plaintiffs again are in the clear.  They present this Court with no evidence that they have tried, or that they are trying and that COVID-19 impedes their efforts.  They speculate to that effect, *see* Doc 4-1, but present this Court with no actual evidence.

Accepting for purposes of argument that the COVID-19 pandemic effectively shortened the plaintiff's period of time for collecting signatures, it did so only by two and a half months.  Had the plaintiffs been active over the winter, they would have very likely been able to have completed most of their signature gathering, and would have the period from June 15, 2020 to August 5, 2020, nearly two more months, in which to complete it.  The United States Supreme Court and the First Circuit Court of Appeals have upheld time frames shorter than New Hampshire's seven-month period, some of which required significantly more signatures.  *See*

*American Party of Texas v. White*, 415 U.S. 767, 786-87 (1974) (finding a 55-day period for circulating petitions in the State of Texas not "an unduly short time" for collecting 22,000 signatures); *Jenness v. Fortson*, 403 U.S. 431, 433, 439-40 (1971) (upholding Georgia ballot access regulations which provided a period of 180 days to circulate nominating petitions); *Barr v. Galvin*, 626 F.3d 99, 110 (1st Cir. 2010) (finding that 60 days to secure 10,000 required signatures was "modest" rather than severe). Other courts have upheld similar requirements. *See Libertarian Party of Florida v. Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (upholding ballot access regulations which limited minor party to 188 days to conduct its petitioning effort); *Stone v. Board of Elections Comm'rs for City of Chicago*, 955 F. Supp. 2d 886, 896 (N.D. Ill. 2013) (finding a 90-day period for collecting 12,500 signatures "not unduly onerous" and "justified by Illinois' interest in regulating access to the ballot"). Even if the COVID-19 pandemic effectively shortened the plaintiffs' period of time for collecting signatures, that burden is not severe or unreasonable.

In the end, the effectiveness of gathering signatures is a function more of money than of time. *Libertarian Party*, 843 F.3d. at 27 ("With $50,000 in hand, a party can obtain 20,000 signatures within two or three months."). Indeed, in 2012, plaintiff LPNH gathered over 13,000 signatures in a two month period using professional petitioners, and unpaid volunteers added another 3,000 to 4,000 signatures to LPNH's 2012 ballot efforts. *Id.* at 23. As of June 30, LPNH claims to have raised over $30,000 for signature gathering purposes. https://lpnh.org/2020-ballot-access/ (last visited July 1, 2020). Plaintiffs need only 17,000 total signatures collectively to get onto the ballot for their respective positions sought, but plan to garner 32,000 signatures.[7] *Id.* LPNH spent $40,000 to obtain 19,000 signatures in 2012. *Id.*

---

[7] Plaintiffs Jorgenson, Cohen, Perry and O'Connell need 3,500 signatures each, while plaintiffs Dumont and Olding need 1,500 each, for a total of 17,000. A voter signing a petition has to be domiciled in the district the candidate

While some costs may have increased, that history strongly suggests that the burden on their ballot access is relatively light, and that, if they had utilized the full seven months they had, they would have already obtained all of the necessary signatures.

In any event, now that the Governor's Stay at Home Order has expired and businesses have reopened across the State, the remaining social distancing guidelines impose at most a slight burden on the plaintiffs' ability to gather nomination papers. The plaintiffs do not suggest that they are unable to hire the necessary professional petitioners or that they cannot enlist volunteers to gather signatures. Plaintiff LPNH has raised a large portion of the funds necessary for the effort. https://lpnh.org/2020-ballot-access/ (last visited July 1, 2020).

Candidates with sufficient support in the State should be able to collect nomination papers within a relatively short period of time. *See Libertarian Party*, 843 F.3d at 27. Particularly where all of the individual plaintiffs are associated with the Libertarian Party, they should be able to rely on the assistance of LPNH supporters and paid petition gatherers. If just 100 LPNH supporters or paid petitioners each obtain nomination papers from just 1 voter a day, the plaintiffs could gather the required number of papers in one month, easily meeting the August 5, 2020 deadline.

Finally, the plaintiffs offer no evidence that the COVID-19 pandemic has in fact burdened actual efforts to obtain nomination papers. The plaintiffs rely solely on the Affidavit of Jilletta Jarvis, the Secretary of LPNH. Doc 4-1. Her affidavit discusses the party's past experiences soliciting nominating papers, but does not describe any efforts made by LPNH in

---

seeks to represent. Thus in many instances, one candidate can gather signatures for several. A candidate for governor or someone working for that candidate, could gather signatures for U.S. Senate candidates and for the U.S. House of Representatives candidate for the district of the voter signing the gubernatorial candidate's petition. 17,000 is the aggregate of signatures all of the plaintiff candidates will need; but that does not mean they need 17,000 voters to sign for them. A well organized and coordinated effort would succeed on a much smaller number of voters if the voters are willing to sign more than one candidate's petition.

2020 to gather signatures, either before or during the state of emergency.  The plaintiffs do not appear to rely, at least not in any meaningful way, on any evidence from the individual plaintiffs themselves to demonstrate any difficulties they personally have experienced while trying to collect signatures.  There is no evidence that any plaintiff made any effort at all to obtain nomination papers during the Presidential Primary in February, town elections in March, or through telephone, mail, or electronic means during the State of Emergency.  Nor is there any evidence that any of them is trying now.  In the absence of <u>any evidence</u> demonstrating efforts made to obtain nomination papers <u>in any way and at any time</u> since January 1, 2020, any burden placed on the plaintiffs' ability to access the ballot due to the COVID-19 pandemic can hardly be considered severe.

## 2.     The Plaintiffs' Legal Authority Is Unpersuasive

The plaintiffs' reliance on four out-of-state cases is unpersuasive because those cases involved much different windows of time for gathering signatures and filing deadlines.  In *Esshaki v. Whitmer*, 2020 WL 2185553, __ Fed. Appx. ___ (6th Cir. May 5, 2020), the plaintiff claimed that Michigan's emergency Stay-at-Home Orders issued in response to the COVID-19 pandemic prevented the collection of signatures "during the timeframe between the imposition of the first Stay-at-Home Order on March 23 and the April 21 deadline for filing the signatures." *Id.* at *1.  Unlike the plaintiffs in this action, the Esshaki plaintiff had gathered more than 700 of the 1,000 required signatures by March 23, when the stay at home order issued.  *Id.*  The court found that the plaintiff would not have had the ability to obtain the remaining signatures given the imposition of the Stay-at-Home Order so close to the deadline.

Similarly, in *Garbett v. Herbert*, 2020 WL 2064101 (D. Ut. April 29, 2020), the plaintiff had to submit 28,000 signatures to access the ballot by April 13, 2020.  *Id.* at *1.  On March 6,

the Governor of Utah declared a state of emergency and almost immediately requested citizens to remain at home, followed by a March 27 "Stay safe, stay home" directive. *Id.* at *3. Unlike the LPNH candidates in the instant case, Garbett had made significant efforts to obtain signatures in the early part of 2020 and "was ostensibly on track to reach the signature threshold when [COVID-19] quickly developed into a global pandemic[.]" *Id.* at *1-*2. Garbett also had continued to try to obtain signatures during the state of emergency, and presented evidence of a significant rate of increase of refusals to sign petitions. *Id.* at *3. Had the plaintiffs in this action been diligent all along only to have the pandemic restrictions issue in the final month or weeks before the deadline, and had they presented evidence of their inability to get the final signatures they needed, they could claim analogy to the *Garbett* plaintiff. *Id.* at *6.

In *Libertarian Party of Illinois v. Pritzker*, 2020 WL 1951687 (N.D. Ill., April 23, 2020), "the 'window' for gathering [ballot access] signatures opened at nearly the same time that Governor Pritzker first imposed restrictions" due to COVID-19, *id.* at *4, and the plaintiffs had to file their completed petitions by June 22, 2020, *id.* at *2. Finally, in *Goldstein v. Secretary of the Commonwealth*, 142 N.E. 3d 560 (Mass. 2020), the window to begin collecting signatures did not open until February 11, 2020, when nomination papers were furnished to the plaintiffs, and the filing deadlines were April 28, 2020, and May 5, 2020, depending on the office being sought. *Id.* at 566.

The theme of the decisional law the plaintiffs advance is that the signature-gathering "window" and filing deadlines fell at the precise time that states were imposing strict restrictions due to the COVID-19 crisis, after plaintiffs had made substantial progress on signature gathering. The plaintiffs cannot remotely claim to find themselves in similar circumstances. They had time prior to the Stay at Home Order, and have time after its expiration in which to gather signatures.

They have raised over $33,000 for the effort. Yet it was not until June 8, 2020 that the plaintiffs took any action at all.

In short, during the period from January until mid-March, and from mid-June to the deadline, the plaintiffs can claim no severe burden as a matter of law. Plaintiff LPNH's own experience provides strong evidence that they would have had sufficient time in which to gather signatures had they not opted to sit idle for at least the first three months of 2020, if not the first six. In any event, the plaintiffs offer this Court nothing but the speculation of the LPNH secretary that they will be unable to obtain the necessary signatures.

At most, the plaintiffs may claim that the period from mid-March to mid-June, when the emergency orders at issue were in effect, imposed something more than the normal statutory burden. But they never did anything about it. Instead, they have waited until now to sue, and ask simply to be put on the ballot even though they, essentially, have taken no action from January to the present to collect the necessary signatures. Plaintiffs' inaction is the true source of any burden they now claim.

The plaintiffs fail to demonstrate any likelihood of success that the combination of New Hampshire's reasonable ballot-access requirements and COVID-19-related restrictions impose a severe burden on their ballot access.

3.  **The State's strong interest in ensuring that candidates have sufficient support before appearing on the ballot outweighs any limited burden imposed on signature-collecting efforts due to the COVID-19 pandemic.**

*Anderson* posits that, while "severe" restrictions on ballot-access require strict scrutiny review, *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992), non-severe restrictions garner no specific, lesser scrutiny, but rather are judged by a balancing scale requiring that the burden "be

justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation,'" *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman v. Reed*, 502 U.S. 279, 288-89 (1992)).

"It is settled beyond hope of contradiction that states have a legitimate interest in ensuring that a candidate makes a preliminary showing of a substantial measure of support as a prerequisite to appearing on the ballot." *Barr*, 626 F.3d at 111; *see also Jenness*, 403 U.S. at 442 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot…."); *Bullock v. Carter*, 405 U.S. 134, 145 (1972) (citations omitted) ("The Court has recognized that a State has a legitimate interest in regulating the number of candidates on the ballot. In so doing, the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections.").

"[W]hen a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Libertarian Party*, 638 F.3d at 14. Here, the State's interest in ensuring that a political candidate has a sufficient measure of support before adding his or her name to the ballot outweighs the minimal burden the pandemic has allegedly imposed on the plaintiffs' right to access the ballot in 2020.

The plaintiffs have failed to meet their burden of demonstrating a likelihood of success on the merits of their claim.

## II.     THE PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM.

In addition to a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must demonstrate an imminent risk of immediate, irreparable harm.  *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("Irreparable harm is an essential prerequisite for a grant of injunctive relief.").  And "the burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant."  *Blinds To Go*, 370 F.3d at 162.  But a plaintiff "does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted."  *Fibs Leasing Co. v. Airdyne Industries, Inc.,* 826 F.Supp. 38, 39 (D.Mass. 1993) (quoting *San Francisco Real Estate v. Real Estate Invest. Trust of America*, 692 F.2d 814, 818 (1st Cir. 1982)); *see also Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury."); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) ("That the government's asserted harm is largely self-inflicted severely undermines its claim for equitable relief.").

The only irreparable harm the plaintiffs allege is the violation of their First Amendment rights.  When "the violation of a constitutional right is the irreparable harm asserted . . . , the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits."  *Turley v. Giuliani,* 86 F.Supp.2d 291, 295 (S.D.N.Y.2000) (citation omitted).  As set forth above, New Hampshire's ballot-access laws, as applied in the context of the 2020 General Election, do not infringe on the plaintiffs' First Amendment rights.  The plaintiffs do not claim any other type of irreparable harm.

Moreover, the plaintiffs offer no evidence to show that the harm they fear will in fact befall them, or is or was not self-inflicted.  The plaintiffs rely solely on the two-page affidavit of

Ms. Jarvis, Doc 4-1, which speculates that efforts over the winter would not have been successful, that alternatives to canvassing such as email campaigns would not have been successful, and that going forward with canvassing now will not be successful. *See* Doc. 4:4. Their speculation about what they may be able to accomplish falls well short of establishing a risk of irreparable harm, particularly given their inaction for over the first half of 2020. *Charlesbank Equity Fund II, LP v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise or a party's unsubstantiated fears of what the future may have in store."). *Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Company, Inc.*, 378 F.3d 29, 34 (1st Cir. 2004) ("Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction.") (quoting *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 902 (1st Cir. 1988)).  As discussed above, in light of the expiration of the State of Emergency and the economic reopening of the State, there is no reason to believe that the plaintiffs will be unable to gather the requisite number of nominating papers by the August 5, 2020 deadline, if they have sufficient support in the State.  Plaintiff LPNH's 2012 experience alone provides the evidence that the plaintiffs, when they commit their time and money, can get the signatures they need. *Libertarian Party*, 843 F.3d at 23.  The plaintiffs must do far more than offer up to this Court the mere possibility that they will be unable to obtain the requisite number of signatures by August 5, 2020; they must establish a likelihood of irreparable harm.

Finally, as discussed above, the plaintiffs have significantly contributed to, if not caused, the harm they claim to risk suffering.  They let the first quarter of the year go by, including a presidential primary and town elections, without launching any signature gathering efforts, after asserting in this Court that a reduction in time from twenty-one down to seven months left them

without sufficient time to gather signatures.  *Libertarian Party*, 843 F.3d at 29.  After the imposition of the Stay at Home Order, the plaintiffs continued to sit idle.  Neither did they challenge the order as applied to their canvassing activities nor did they even attempt any alternative signature gathering efforts.  Only now, free of stay at home restrictions, the plaintiffs speculate that they cannot gather sufficient signatures by August 5, 2020.  To the extent that they no longer have enough time, it is because they started too late.  They cannot now base not just a preliminary injunction, but the extraordinary request of being relieved of all statutory signature requirements, and, by judicial fiat, being placed on the ballot, on their failure to come to life until late June 2020.  *Fibs Leasing Co. v. Airdyne Industries, Inc.,* 826 F.Supp. at 39; *Second City Music,* 333 F.3d at 850; *Al Otro Lado v. Wolf*, 952 F.3d at 1008.

## III.     THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST ALIGN WITH THE DEFENDANTS.

The balance of the equities and the public interest favor permitting N.H. Rev. Stat. Ann. § 655:40 and N.H. Rev. Stat. Ann. § 655:42 to remain in full force and effect for the 2020 General Election.  These statutes are valid and constitutional election regulations that ensure candidates have a significant modicum of support before appearing on the ballot.  Enjoining the full operation of these laws would frustrate the will of the electorate and could negatively affect the administration of the 2020 General Election.  *See Bullock*, 405 U.S. at 145 (In regulating the number of candidates on the ballot, "the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections.").

The plaintiffs' situation, by contrast is one in which they share a significant amount of cause. Whatever equities the plaintiffs can claim are greatly reduced by their own contribution to their situation. In short, the equities cannot favor one who procrastinates over known statutory obligations that have been confirmed as constitutional.

Consequently, the balance of the equities and the public interest favor the defendants.

## CONCLUSION

Based on the foregoing, the plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied. In the event this Court were to grant a preliminary injunction, the defendants request an immediate stay of that injunction so they may take an expedited appeal of it to the First Circuit.

Respectfully submitted,

CHRISTOPHER T. SUNUNU,
GOVERNOR OF THE STATE OF NEW
HAMPSHIRE

and

WILLIAM GARDNER,
NEW HAMPSHIRE SECRETARY OF STATE

By their attorneys,

GORDON J. MACDONALD
ATTORNEY GENERAL

Date: July 2, 2020

*/s/ Daniel E. Will*
Daniel E. Will, Bar #12176
Solicitor General

*/s/Laura E. Lombardi*
Laura E. Lombardi, Bar #12821
Senior Assistant Attorney General

*/s/Sean R. Locke*
Sean R. Locke, Bar #265290
Assistant Attorney General

New Hampshire Department of Justice
Office of the Attorney General
33 Capitol Street, Concord, NH  03301-6397
(603) 271-3650

**CERTIFICATE OF SERVICE**

I, Daniel E. Will, hereby certify that a copy of this memorandum of law in support of the defendants' objection to plaintiffs' emergency verified motion for temporary restraining order and preliminary injunction was sent via the court's e-filing system to H. Jonathan Meyer, Esquire, counsel for the Plaintiffs.

July 2, 2020                                    */s/ Daniel E. Will*
                                               Daniel E. Will