# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **LIBERTARIAN PARTY OF NEW HAMPSHIRE,** ) <br> ) <br> and ) <br> ) <br> **JO JORGENSON** ) <br> ) <br> and ) <br> ) <br> **SPIKE COHEN,** ) <br> ) <br> and ) <br> ) <br> **DARRYL PERRY,** ) <br> ) <br> and ) <br> ) <br> **JUSTIN O'DONNELL** ) <br> ) <br> and ) <br> ) <br> **ZACK DUMONT** ) <br> ) <br> and ) <br> ) <br> **ANDREW OLDING,** ) <br>     Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> **GOVERNOR CHRISTOPHER T. SUNUNU** ) <br> In his official capacity as ) <br> Governor of the ) <br> State of New Hampshire ) <br> ) <br> and ) <br> ) <br> **WILLIAM GARDNER,** ) <br> in his official capacity as ) <br> Secretary of State of the ) <br> State of New Hampshire, ) <br>     Defendant ) | Civil Case No.: 1:20-cv-00688 |

# PLAINTIFFS' REPLY MEMORANDUM TO DEFENDANTS' OBJECTION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1. INTRODUCTION

Despite its length, Defendants' Memo does not contest the legal standards or applicable case law set forth by the Plaintiff. Instead, it relies upon false speculation regarding the Libertarian Party's canvassing activities, and claimed lack thereof, and upon the demonstrably false premise that after the expiration of the Governor's Stay at Home Order in June, there were no significant impediments to the Party's opportunity to secure the requisite number of the nomination petitions. Defendants' position not only runs contrary to the current facts of the pandemic, which severely burdens the collection of petitions, it is also inconsistent with the Governor's message in other forums about the critical need for continued vigilance and precautions regarding interpersonal interactions. The current spike in the number of new cases nationwide reinforces that caution, and underlines the falsity of Defendants' claim that the Libertarian Party can collect petitions without experiencing any significant pandemic-induced burden.

This court has with respect to its own operations determined that the same limitation on its activities which it deemed necessary in March should continue until at least August 1, 2020, four days before the deadline for the submission of nomination papers. The unfortunate reality is that the same public health concerns which even Defendants concede substantially burdened the Plaintiffs' opportunity to secure petitions from April to June are still present. Plaintiffs should not be required to place themselves, their volunteers or individual voters at risk in order to vindicate their constitutional rights.

## 2. PANDEMIC INDUCED SEVERE BURDEN

Notwithstanding the efforts of Defendants to minimize to the point of discounting altogether the burdens placed by the pandemic on the process of securing nomination papers, the State has recognized in other contexts how much it has affected the entirety of the electoral process. In his statement on the appointment of the Select Committee on 2020 Emergency Election support, Secretary of State Gardner prefaced his announcement by referencing", "the unprecedented challenges to voting posed by the coronavirus pandemic . . . ". See attached.

The Select Committee report (June 3, 2020) itself states:

> The Committee quickly learned that at each stage of the Political Calendar, which has already begun, actions which normally are taken in person, are impossible or imprudent due to the effects of the virus. p.14.

It further noted, "in the pandemic environment, it is important to avoid in-person contacts anywhere, not just at the polls." (emphasis in the original). p.19. With reference to the ID exchange required for registration, it recommended, in addition to social distancing, the use of a plexi-glass shield, and that after any exchange of ID's, the poll worker should change gloves. p.7. The need for these or similar precautions for canvassers, either going door to door or soliciting from fixed table locations, demonstrates how much more burdensome and potentially risky the collection of nomination petitions has become. The Committee further noted:

> Legal requirements for independent candidates and third parties to go get petition signatures are complex in normal times. In this time of social distancing,

stay-at-home orders and the like, they may make those actions impossible on a practical basis. p.23.

Defendants complain that Plaintiffs' claim relies upon "bygone emergency orders", memo at 17, as if the Stay at Home restrictions are an anachronism of interest only to historians. They claim "as of June 15, 2020, the Stay at Home order has expired, and the Plaintiffs again are in the clear". Memo at 18. And insist that "the remaining social distancing guidelines impose only a slight burden on the Plaintiffs ability to gather nomination papers". Memo at 20.

The focus of the Joint Committee Report is upon the primary and the election, events that will not occur until the fall. There is not the slightest suggestion in that Report that the precautions and safeguards that are required to make the electoral process reasonably safe, will be any less necessary or burdensome in the forseeable future.

The burden placed on petition gathering by the pandemic has been widely recognized in the case law. As the Federal District Court of Utah observed in <u>Garbett v. Herbert</u>, 2020 WL 2064101 (4/29/2020), the pandemic has been "a public health crisis without modern equivalent." p.21. It concluded that "in light of nearly all public events being canceled, orders for people to stay 6 feet apart and to stay home, and the extraordinary impact on nearly all aspects of everyday life, it is difficult to imagine a confluence of events that would make it more difficult for a candidate to secure signatures." <u>Id</u>. at 25. In <u>Goldstein v. Secretary of Commonwealth</u>, (S.J.C. 4/16/2020), both the challengers and the Commonwealth of Massachusetts were in agreement that:

As a practical matter, application of the signature requirements in the context of the current public health crisis imposes a greater than usual burden on [the Plaintiffs] triggering heightened scrutiny. p.3.

The court noted:

If a candidate seeks to obtain signatures on nomination papers in traditional ways, he or she reasonably may fear that doing so might risk the health and safety of not only the person requesting the signature, but also the persons who are signing, and the families with whom they live and potentially their entire community.

In short, as the Secretary rightly and readily acknowledges, the minimum signature requirements, which may only impose a modest burden on candidates in ordinary times, now imposes a severe burden, of significant interference in the candidate's right to gain access to the September 1st primary ballot . . . ." pp.19-20.

In the case of <u>Libertarian Party of Illinois v. Pritzker</u>, (N.D. Ill. 2020 WL 1951687, 4/23/2020), the Federal District Court for the Northern District of Illinois noted:

The combined effect of the restrictions on public gatherings imposed by Illinois' stay-at-home order and the usual in-person signature requirements in the Illinois electoral code is a nearly insurmountable hurdle for new party and independent candidates attempting to have their name placed on the general election ballot. p.7.

In attempting to contest the application of these observations founded in recent experience and common knowledge, Defendants attempt to shift the responsibility to the Plaintiffs for circumstances obviously outside their control. Their argument relies on three demonstrably false assertions:

1. That the Libertarian Party made no meaningful effort to secure petitions prior to the Governor's Stay at Home order.

2. That during the Stay at Home order, the Plaintiffs made no efforts to secure petitions.

3. That subsequent to the Stay at Home order in June, the Party could resume normal petitioning activity with only slight restrictions, but has deliberately decided not to.

### A)  JANUARY TO MARCH 2020

Defendants' brief is full of undocumented assertions about how the Plaintiffs "created their own burden" p.2, "did little or nothing to gather any signatures between January 1, 2020 . . . until mid-March 2020", p.3. "idled away the first quarter of 2020 (p.6), missed prime opportunities to gather signatures" p.7, "deliberately declined to deploy supporters to these polling places," p.7, "and deliberately missed their opportunity to gather their statutory requirement of signatures before the pandemic took hold" (p.8). Even within the partisan world of brief writing, these false characterizations are over the top.

Defendant's claims are predicated upon a single paragraph in the Jarvis affidavit:

6

> 7. For this election cycle, it had been our intention to focus our solicitation activities during the spring and summer when the weather would be conducive to in-person solicitations. Further our presidential candidates were not selected until May at the National Convention."[1]

Nowhere does she assert or acknowledge that the Party made no efforts to secure petitions before March. As set forth in her attached Supplemental Affidavit, the Party <u>did</u> collect nomination papers during the first part of the year, including seeking signatures during primary voting.

It does not take extended acquaintance with New England weather to understand the Party's decision to plan its outdoor solicitation activities for the spring and summer. The wisdom of this decision should not be evaluated based on hindsight knowledge of the pandemic. As the court stated in <u>Garbett</u>:

> Candidates should not be penalized where they 'had planned to ramp up signature collection efforts in March in April, when warmer spring weather accommodate outdoor activities and would be more conducive to large social gatherings and door-to-door canvassing.' (p.24, fn101) (citations omitted)."

Defendants cite a host of cases upholding time limits for collecting petitions. But these cases, which precede the pandemic, are not pertinent here. Plaintiffs are not claiming that under normal circumstances the seven months would be an inadequate time frame. Our argument is that because of the conditions caused by the pandemic the

---

[1] Defendants conspicuously ignore the last sentence, and the fact that, with respect to the Party's presidential candidates, that Plaintiffs had no opportunity to collect signatures until the end of May.

Plaintiffs have had far less actual time to engage in canvassing and other solicitation efforts, and for most of that time their efforts have been severely burdened by limitations imposed by the pandemic, which they could not reasonably have foreseen.

### B) STAY AT HOME – MARCH TO JUNE 2020

Once again, the State's objection makes purported factual claims without support in the record. It asserts that "between late March 2020 and June 8, 2020, when the Governor's 'Stay at Home' order was in effect, the Plaintiff failed to explore alternatives to in-person canvassing . . . ". p.3. "The Plaintiffs apparently made no attempt to solicit signatures by any means following the declaration of the State of Emergency", p.9. "The Plaintiffs did not even explore alternatives to in-person canvassing such as electronic mail, telephonic or other solicitation." p.18. No support in the record is provided for these false assertions. As set forth in the Supplemental Jarvis Affidavit, the Libertarian Party and its representatives utilized both electronic mail and regular mail while the stay-at-home order was in place in a largely unsuccessful attempt to secure nomination petitions.

The second assertion that the State makes regarding this time frame: that suit was not filed until June 8, 2020 is accurate. However, that only tells part of the story. The Libertarian Party and its representatives engaged in extraordinary almost daily efforts with the Secretary of State, the Select Committee, the Attorney General, and with the Governor, to have the nomination petition process modified based on the conditions of the pandemic. See Supplemental Jarvis Affidavit. Given that in a majority of other states where this issue has arisen, it has been resolved by executive order or legislative decree, it was appropriate and reasonable that the Party go through these efforts prior

8

to going to court. Not until May was the Party definitively informed by the Governor's statement at a press conference, that no changes would be made. Plaintiffs should not be penalized for attempting to first resolve the obstacles to the exercise of their constitutional rights through the political processes available to them.

### C) JUNE 15, 2020 TO AUGUST 5, 2020

Defendants falsely claim that "the record reflects that the Plaintiffs filed this action, but otherwise have not made any attempts to gather the necessary signatures beyond advertising on June 27, 2020 for volunteers to help gather signatures." p.10. In fact, as set forth in Jarvis' Supplemental Affidavit, the Party has been actively attempting to secure additional signatures, and has had some success, particularly using a table in front of a supermarket. However, under the conditions of the pandemic, it is understandable that most people have no interest in conversing with a stranger coming to their front door, or approaching a petitioning table in front of a store and exchanging nomination papers with a solicitor, nor do most retail establishments want a congregation of people outside of their front door.[2]

The unfortunate current facts of the pandemic contradict Defendants' claim that Plaintiffs' efforts are not being severely burdened, and make clear the need for judicial relief. The Governor himself has emphasized that notwithstanding the expiration of the Stay at Home order (which he replaced with a Safer at Home order), the continuing importance of social distancing and other precautions which burden canvassing. His

---

[2] Recently, the police were called by an angry customer at a grocery store whom inaccurately believed that a Libertarian Party solicitation table outside the store was violating social distancing guidelines.

Emergency Order #52 of June 15, 2020, which Defendants purport to rely upon, makes clear that it was not a signal to return to normalcy. In pertinent part, it states:

> "WHEREAS the COVID-19 pandemic continues to affect New Hampshire residents and to require preventative measures, with necessary and appropriate modification, as more becomes known about the virus, for the purpose of stopping the spread of COVID-19 and maintaining the progress our State has made in fighting the pandemic; and
>
> WHEREAS the COVID-19 pandemic has necessitated dramatic and unprecedented preventative measures within state and federal governments in the United States, as well as within communities, home offices and individual lifestyles; and
>
> ---------     ---------     ----------     ----------     ----------
>
> WHEREAS, though there is the continued need to take significant precautions, New Hampshire's actions to date appear to have succeeded in stabilizing the rate of increase in cases of COVID-19; and
>
> ---------     ---------     ----------     ----------     ----------
>
> WHEREAS, while New Hampshire is on the right path to continue to move toward to fully reopening its economy, COVID-19 is still prevalent in New Hampshire and the steps taken must continue to be gradual, based on data and done in consultation with public health experts; and

>WHEREAS, in consultation with the Division of Public Health and with the stakeholders across the State, the Governor has determined that New Hampshire is prepared to transition from a stay at home order to a safer at home advisory to mitigate the spread of COVID-19."

Accordingly, persons under 65 are advised to limit out of home trips to specific and essential purposes, and persons over 65 are advised to stay in their homes as much as possible. Escalating infection numbers at the national level further reinforced the conclusion that any significant easing of the burdens on petitioning is not in sight.

The challenge for the Libertarian Party is not just recruiting persons to go door-to-door or staff tables in front of supermarkets, both of which activities carry a significant level of risk. But also to induce people to speak to the solicitors and exchange and sign the nomination papers after they have been appropriately advised to only engage in essential activities, and that every stranger (and even friend) and every surface, is a potential source of infection. If this is not a severe burden upon the collection of nomination papers, it is hard to imagine anything short of a state-wide quarantine which would meet that standard. The State's suggestion that the Libertarian Party can collect petitions with minimal modification of its normal solicitation activities amounts to a denial of the current reality, and verges upon encouragement to violate public health standards.

In their main Memo, Plaintiffs rely upon the case law from other states finding that the circumstances of the pandemic have created a severe burden upon securing nomination petitions. Defendants argue that these cases' are inapposite because they involve different time frames, in particular, ballot deadlines that expired during or shortly

after the expiration of the stay at home orders. But as has been made clear by recent developments, that is a distinction without a difference. Any expectation in April that the obstacles to canvassing would largely disappear over the summer has been dashed. Substantially the same practical limitations upon securing petitions including the cancellation of almost all large events, and the extreme difficulty of door-to-door canvassing while the fear of infection is so rampant, remain in effect. Thus, the seven weeks between expiration of the Stay at Home order and the deadline which Defendants claim distinguish this case from all others, does not lessen Plaintiffs' need for a remedy to protect their constitutional rights.

Defendants sole attempt to support their claim that the burden substantially lessened post June 15, 2020 is their reference to "several large gatherings of politically active people in public places – a perfect opportunity for signature gathering". Memo at 10. This appears to be a reference to various Black Lives Matter vigils. Defendants do not consider whether participants at such vigils would have welcomed petition gatherers for a political party not known for its sympathy with their objectives. They further ignore that these gatherings occurred with minimal advance notice which would have complicated complying with any permitting requirements. However, most importantly, whatever spontaneous gatherings have occurred recently do not begin to make up from a canvassing point of view for all of the group activities which have been canceled or postponed ranging from Concord's Sidewalk Days to Fisher Cat baseball games. If the opportunity to collect nomination petitions is to be judged in significant part by the availability of large group activities, which in a typical New Hampshire summer occur

every weekend at multiple locations, then that opportunity has been diminished almost to the point of elimination.

### 3. THE STATE'S INTEREST

The interest claimed by the State in maintaining the existing requirements is to ensure "that a political candidate has a sufficient measure of support before adding his or her name to the ballot . . .". Memo at 24. It claims this in turn prevents "ballot clutter". Memo at 16. However, in their brief, Defendants undercut this interest through their assertion that "in the end, the effectiveness of gathering signatures is a question more of money than of time". Memo at 19. If this is correct, if a large enough bank account can purchase the resources required to secure the requisite number of signatures regardless of other circumstances including public appeal, then the nomination signature requirement is a proxy for wealth not community support. Given that this case, as Defendants acknowledge, is about the exercise of fundamental First Amendment rights, the exercise of those rights should not be dependent upon the wealth of the candidates and the party. The issue should not be how many solicitors the Libertarian Party can afford to hire, but whether the type of canvassing activities it has engaged in over many election cycles to successfully secure the required number of nomination petitions have been severely burdened by the conditions of the pandemic.

Defendants also reference the intent of the electorate in setting requirements for ballot access. That argument might have weight under normal circumstances. But there is no conceiveable reason to believe that the electorate would have wanted to apply the same requirements under circumstance so far removed from the normal political campaign.

## 4. NARROWLY TAILORED

The best demonstration of a party's community support under the circumstances of the pandemic, which severely limit conventional interactions, is not financial resources, but a demonstrated history of securing nomination petitions in past cycles. Libertarian Party candidates have succeeded in every cycle since 2008. Relying on past performance in the electoral process is fully consonant with New Hampshire's election law which specifically recognizes that a party's performance in one election cycle can entitle it to placement on the ballot in the next. See NH RSA 652:11 defining "Party" as any political organization which received at least four percent of the votes at the preceding election.

Thus, the nomination petition requirement is not narrowly tailored to the State's interest in demonstrating community support because under pandemic circumstances that same interest is better served by the Party's demonstrated history of having met the petition threshold. To the extent gathering petitions is proxy for community support under normal circumstances, that correlation has been substantially disrupted by the understandable fear of people otherwise receptive to engage with petitioners.

## 5. REMEDY

Even Defendants concede that during the pendency of the Stay at Home order between March and June, Plaintiff's ability to secure nomination petitions was substantially restricted. This amounts to nearly three of the seven months set forth for collecting nominations. Accordingly, if the remedy addresses the numerical requirement, the number of required nomination papers should be reduced by at least 40% to

14

compensate for this lost time frame. Put another way, Plaintiffs securing 40% of the required nomination papers in 40% of the time would demonstrate the same level of community support as gathering 100% of the required papers in 100% of the time. See Garbett v. Herbert, Supra at p.30.

> If 28,000 signatures is sufficient to show a modicum of support under normal circumstances, surely some lower number would reflect a comparable level of support during an election cycle when public gatherings have been shut down, citizens have been told stay six (6) feet apart from one another and the Governor has further directed people to stay home.

In this case, Plaintiffs not only lost the three (3) months that the Stay at Home order was in place, but their efforts have been and are substantially restricted for the remaining seven weeks. Accordingly, the remedy should reflect that even according full weight to the winter months, Plaintiffs had no more than one third of the opportunity to collect nominating petitions that they would have had in a normal election cycle.

Plaintiffs believe that the most appropriate remedy would be to order they be accorded ballot access based on their candidates meeting petition thresholds in past cycles. In regard to the exercise of their First Amendment rights, that would achieve the ultimate goal of restoring the exercise of their First Amendment rights to where they would have been absent the pandemic.

## CONCLUSION

Plaintiffs respectfully request that this Court fashion a remedy which effectively protects their First Amendment rights.

Respectfully submitted,

Libertarian Party of
 New Hampshire

By It's attorneys,

Backus, Meyer & Branch, LLP

Dated:  7/13/20    By:    /s/ Jon Meyer
Jon Meyer, NH Bar # 1744
116 Lowell Street, P.O. Box 516
Manchester, NH 03105-0516
603-668-7272
*jmeyer@backusmeyer.com*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been delivered electronically, via ECF/NexGen, this 13th day of July, 2020 to all counsel of record.

 /s/ Jon Meyer

Jon Meyer