# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

```
*************************************
LIBERTARIAN PARTY OF                  *
NEW HAMPSHIRE, et al                  *
                                      *
         Plaintiffs,                  *
    v.                                *   Civil No. 1:20-cv-00688-JL
                                      *
GOVERNOR CHRISTOPHER T.               *
SUNUNU, Governor of the State of      *
New Hampshire, in his official capacity, *
                                      *
         And                          *
                                      *
WILLIAM M. GARDNER, Secretary of      *
State of the State of New Hampshire,  *
in his official capacity,             *
                                      *
         Defendants.                  *
                                      *
*************************************
```

## SURREPLY TO PLAINTIFFS' REPLY TO OBJECTION TO PLAINTIFFS' EMERGENCY VERIFIED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

NOW COMES Governor Christopher T. Sununu, in his official capacity as Governor of the State of New Hampshire ("Governor") and William M. Gardner, in his official capacity as Secretary of State for the State of New Hampshire ("Secretary of State") (collectively "State"), by and through their counsel, the New Hampshire Office of the Attorney General, and respectfully submit this surreply to respond to the plaintiffs' reply to the State's objection to their motion for preliminary injunction, and state as follows:

1.   The plaintiffs bear the burden to prove their entitlement to a preliminary injunction. Initially, to support their motion, the plaintiffs offered only the affidavit of Jilletta Jarvis ("Jarvis Aff."). While the plaintiffs excoriate the State for "false characterizations" they

claim are "over the top," Pl. Reply at 6, the Jarvis Aff. offered no evidence of any activity at all during the first quarter of 2020. To the contrary, Ms. Jarvis explained that the Libertarian Party of New Hampshire ("LPNH") intended to "focus our solicitation activities during the spring and summer . . . ." Jarvis Aff. ¶7. Given the record the plaintiffs created, on an issue on which they bear the burden, their criticism of the State's response is not well taken. The Jarvis Aff. allowed for no conclusion other than that the plaintiffs had conducted no nomination paper gathering activity between January 1, 2020 and March 13, 2020.

2. Tacitly recognizing their failure of proof, the plaintiffs included with their reply Ms. Jarvis' supplemental affidavit ("Supp. Aff." or "supplemental affidavit"). But the supplemental affidavit does little to change the accuracy of the State's assertions. Ms. Jarvis now broadly claims that LPNH "began collecting nomination petitions in January 2020," Supp. Aff. ¶1, but apparently on just one day, the presidential primary, *id.* ¶ 5. Ms. Jarvis offers no other example of any activity between January 1 and March 13, 2020.

3. From March 13, 2020 to June 15, 2020, Ms. Jarvis claims – for the first time in this litigation – that LPNH sent out 350 letters seeking nomination petitions. Supp. Aff. ¶7. Yet, LPNH has contact information for as many as 4,000 registered voters. Supp. Aff. ¶3 ("In 2016 we collected between 5,000 and 6,000 petitions of which approximately 2,000 were deemed invalid."). Ms. Jarvis also claims that an unidentified candidate – apparently not one of the actual plaintiffs in this action – sent out between 500 and 1,000 emails during the same time period. Supp. Aff. ¶7. So even with Ms. Jarvis' supplemental affidavit, the plaintiffs' evidence of their signature collecting efforts between March 13, 2020 and June 15, 2020 are these two alone. At most, Ms. Jarvis' supplemental affidavit changes the State's assertion that the plaintiffs did nothing, to they did very little, to collect nomination papers for the first half of

2020. The plaintiffs have failed to meet their burden of proof, yet criticize the State for pointing that out. Pl. Reply at 6 (arguing that the State's "false characterizations are over the top.").

4. Ms. Jarvis' supplemental affidavit does little to bolster the plaintiffs' contention that they have been diligently trying to collect signatures since June 15, 2020. Plaintiffs express concern for the safety of canvassers, but do not say that they are unable to hire canvassers, or find volunteers. Pl. Reply at 11. To the contrary, someone staffed a table for LPNH outside of Market Basket in Bedford over the July Fourth weekend. Supp. Aff. ¶17. Beyond that one specific example, Ms. Jarvis loosely contends that "in recent weeks we have had people going door to door to collect petitions. However their efforts have been largely unsuccessful. . . ." Supp. Aff. ¶16. Ms. Jarvis offers no further details, falling well short of the plaintiffs' burden to establish a likelihood of success that the nomination paper requirements constitute a severe burden. *See Libertarian Party of Connecticut v. Merrill*, 2020 WL 3526922 *10 (D. Conn. June 27, 2020) (regarding a candidate's 45-minute effort seeking signatures door to door, "[t]his very limited experience is insufficient to persuade the court that in-person petitioning is impossible, particularly in light of the evidence before the court of successful in-person petitioning.").

5. Similarly, the plaintiffs acknowledge large public gatherings, but express their own, unquantified concern that participants at these gatherings would not "have welcomed petition gatherers for a political party not known for its sympathy with their objectives." Reply at 12. The plaintiffs refer to the Black Lives Matter rallies, assume hostility, but make no assertion that they attempted to obtain signatures at those rallies or at other public gatherings, such as the "Re-open NH" rallies, whose participants the plaintiffs might have presumed would be more sympathetic. https://www.facebook.com/reopennh/ (last visited July 16, 2020). Re-open NH reports that it held two rallies on April 18, 2020 with 306 and 43 guests respectively,

and rallies on May 2, 2020 with 313 guests, May 16, 2020 with 212 guests, June 6, 2020 with 470 guests, June 27, 2020 with 197 guests, and July 4, 2020 with 242 guests. State's Exhibit I (Re-open NH Events web page); State's Exhibit J (Re-open NH Independence Day rally Facebook post). Had plaintiffs secured an average of just 200 signatures per rally, they would have had 1,400 by July 4, 2020.

6. The plaintiffs make much of a statement in the Final Report of the Select Committee on 2020 Emergency Election Support. Pl. Reply at 3-4. That report is the product of a committee created on April 27, 2020, charged with advising "the Department of State on the use of $3.2 million of federal CARES Act money." Election Report at 1. The committee of six included the Ballot Law Commission chair, two legislators, a former town clerk, a moderator and a former gubernatorial legal counsel. Their report contained recommendations, and, as is clear from the cover sheet to the report, the Secretary of State focuses on the conduct of the election itself, not the gathering of nomination papers, the former of which presents significantly greater pandemic related complications. In any event, the relevance of the committee's comment about signature gathering, and how it helps the plaintiffs establish the severe burden they claim, remains uncertain. *Libertarian Party of Connecticut v. Merrill*, 2020 WL 3526922 * 10 (D. Conn. June 27, 2020) (Governor's statement on March 28, 2020 "that in-person petitioning was not feasible on the timeline required by statute," "does not support the conclusion that in-person petition remains not feasible now," given, among other things, that the pandemic has abated and Connecticut has begun the process of reopening).

7. Finally, the plaintiffs misunderstand the State's argument, based on a First Circuit decision affirming this Court's rejection of LPNH's claims, that collecting signatures is a function of money as much as time. Pl. Reply at 13 ("if a large enough bank account can

purchase the resources required to secure the requisite number of signatures . . . then the nomination signature requirement is a proxy for wealth not community support."). The point is not whether a party must have financial resources to mount a ballot drive – even LPNH has raised substantial sums for this year and has spent substantial sums in the past. *See* State's Exhibit C (LPNH Ballot Access Drive web page) (LPNH has raised over $33,000 and seeks to raise $80,000 for a nomination paper signature drive); *Libertarian Party of New Hampshire v. Gardner*, 843 F.3d 20, 27 (1st Cir. 2016) ("With $50,000 in hand, a party can obtain 20,000 signatures within two or three months (or seven days if we use LPNH's July 2012 experience as a gauge)."). The point is that LPNH is able, armed with resources reflecting public support, to gather the significantly fewer necessary signatures than it needed in 2014 easily within the period from June 15, 2020 until the August 5, 2020 deadline. *Libertarian Party of New Hampshire,* 843 F.3d at 27.

8. The plaintiffs' reply offers no helpful legal authority in support of their assertion of a severe burden on access to the ballot. In addition to the authority in their motion for preliminary injunction, which, as the State explains in its objection, is inapposite to this action, the plaintiffs offer a decision from the Massachusetts Supreme Judicial Court issued on April 27, 2020, *Goldstein v. Secretary of the Commonwealth*, 142 N.E.2d 560 (April 27, 2020), which stands in contrast to the situation in this action in many ways. First, similar to the authority in their preliminary injunction motion, *Goldstein* concerned Massachusetts signature requirement deadlines that fell during the pendency of stay at home and other restrictive emergency orders. Candidates had a concentrated period of time – from February 11, 2020 until April 28, 2020 or May 5, 2020, in which to gather, for some offices, as many as 10,000 signatures. 142 N.E.2d at 565-66. The Massachusetts Governor declared a state of emergency on March 10, 2020, and, on

March 23, 2020, issued an order prohibiting gatherings of greater than 10 and closing all nonessential businesses. *Id.* at 567-68. *Goldstein*, in other words, presents another case in which (1) signature gathering timelines were significantly tighter than in New Hampshire, and (2) the pandemic struck and society shut down toward the end of the signature period.

9. In addition, *Goldstein* apparently arose under Massachusetts and not federal constitutional law and the Massachusetts "Secretary of State rightly and readily acknowledges, the minimum signature requirements . . . now impose a severe burden . . ." on ballot access. *Id.* at 571. In fact, the Massachusetts Secretary of State *proposed* a 50% reduction in signatures required. The *Goldstein* parties never presented a dispute to the court concerning the severity of the burden.

10. Even under those circumstances, the Massachusetts SJC refused the plaintiffs' request to be relieved of all signature requirements. *Id.* at 572 ("We decline to order this remedy; . . . Even in the midst of the pandemic, the State has a legitimate interest in ensuring that a candidate makes a preliminary showing of support among the electorate before appearing on the ballot."). The court emphasized that the plaintiffs had enjoyed half of the signature gathering period – from February 11, 2020 to March 23, 2020 – in which to gather signatures. *Id.* The Court also emphasized that, since March 23, 2020, gathering signatures is not impossible. *Id.* Under all of those circumstances, which differ in almost every way from New Hampshire's, the court ordered a signature number reduction of 50%. *Id.* at 573.

11. And the plaintiffs overlook recent, analogous decisional law, including in which the Libertarian Party was plaintiff, in which courts have determined that signature requirements did not severely burden access to the ballot notwithstanding the pandemic. In *Thompson v. Dewine,* 959 F.3d 804, 806 (6th Cir. May 26, 2020), the court considered a stay of a district

court's injunction against Ohio signature gathering requirements necessary to get a ballot initiative included on the ballot. Employing the same analytical framework as candidate ballot access challenges, the court found no severe burden. The court observed that the five week period remaining from the lifting of restrictions "undermines the Plaintiffs' argument that the State has excluded them from the ballot." 959 F.3d at 810.[1] The court continued:

> Plaintiffs' claim effectively boils down to frustration over failing to procure as many signatures for their petitions (because of social distancing and reduced public crowds) as they would without the pandemic. But that's not necessarily true. There's no reason that Plaintiffs cannot advertise their initiatives within the bounds of our current situation, such as through social or traditional media inviting interested electors to contact them and bring the petitions to the electors' homes to sign. Or Plaintiffs could bring their petitions to the public by speaking with electors and witnessing the signatures from a safe distance, and sterilizing writing instruments between signatures.

*Id.* at 810; *see also Whitfield v. Thurston*, 2020 WL 3451692 *21 (E.D. Arkansas June 24, 2020).

Perhaps most important, the court concluded:

> Moreover, just because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are *excluded* from the ballot. And we must remember, First Amendment violations require state action. So we cannot hold private citizens' decisions to stay at home for their own safety against the State. Because the State has not excluded Plaintiffs from the ballot, the burden imposed upon them by the State's [signature] requirements cannot be severe.

*Id*. (quotation and citation omitted) (emphasis in original); *see also Lyons v. City of Columbus*, 2020 WL 3396319 (S.D. Ohio June 19, 2020) ("To the extent Plaintiffs have faced a new reality

---

[1] The relevant Ohio emergency orders expressly exempted First Amendment protected activity from restriction. The court, however, analyzed the severity of the burden as if the exemption did not exist and the signature gatherers were restricted from their activity during the imposition of the emergency orders. *Id.* at 810. In New Hampshire, Emergency Order #17, which closed nonessential businesses, included elections personnel among essential businesses permitted to remain open. State's Exhibit E (Emergency Order #17) at Exhibit A, Other Community-Based Essential Functions; *see also Common Sense Party v. Padilla*, 2020 WL 3491041 *3 (E.D. California June 26, 2020).

since March 2020 – the difficulty of signature-gathering in this time of pandemic, social distancing and changed behavior of [signers] – the difficulty is not the type of state-imposed burden on speech that the First Amendment prohibits.").

12. In *Libertarian Party of Connecticut v. Merrill*, 2020 WL 3526922 (E.D. Conn. June 27, 2020), for another example, the Libertarian Party of Connecticut sought suspension of signature requirements similar to New Hampshire, which required them to gather approximately 7,500 or 2,800 signatures, depending on office sought, in the period from January 2, 2020 to August 5, 2020. 2020 WL 3526922 at *3. Similar to New Hampshire, the gathering period began January 1, 2020 and the Connecticut Governor issued stay at home and other restrictive orders on March 20, 2020 and March 26, 2020. *Id.* Unlike New Hampshire, the Connecticut Governor reduced the signature requirement to .70% from 1% of actual voters in the previous election, and capped the maximum number required at 5,250. This left the requirements somewhat similar to New Hampshire's unadjusted requirements, depending on the office sought. *Id.* In addition, Connecticut eased some of the signature gathering requirements, such as the requirement that the signature gatherer witness the signing of the nomination papers. *Id.*

13. The court first observed that the Governor's orders, similar to New Hampshire, did not prohibit in-person soliciting. *Id.* at *7 ("Although these orders impact in-person soliciting, none expressly prohibits it or restricts it, certainly not by the candidate or volunteer petitioners."). *See* State's Exhibit E (Emergency Order #17) at Exhibit A, Other Community-Based Essential Functions (listing elections personnel as essential workers). The Court also acknowledged the plaintiffs' contention, similar to the plaintiffs in this action, that "their candidates do not begin petitioning until late spring." *Id.* Thus, even if the emergency orders prohibited in-person soliciting, the orders had expired by the time the plaintiffs, by their own

admission, would have begun in-person soliciting. *Id.; see also* Jarvis Aff. ¶7 ("For this election cycle it had been our intention to focus our solicitation activities during the spring and summer . . . .").

14. As to the severity of the burden, the court concluded that "[e]ven with the challenges that COVID-19 presents, the court cannot conclude, based on the record before it, that Connecticut's petitioning requirements would exclude or virtually exclude a reasonably diligent candidate from the ballot. The signature requirement - .70% of last election's voters – is not excessive, and the petitioning period – seven months – is substantial." *Id.* The court concluded that "[a]dmittedly, the threat of COVID-19 will pose difficulties for [signature gatherers], even as the state continues the process of reopening. But whether the plaintiffs' success rate is 40%-50% of normal, or some lower number, in-person petition circulation has been and remains an option for all candidates." *Id.* at *10. To be sure, the Connecticut situation differs from New Hampshire, in the small percentage reduction in signature requirements and the relaxed signature gathering requirements, but the court's fundamental points apply equally to the plaintiffs in this action, and the court found no reason to simply order the plaintiffs included on the ballot.

15. Other courts have similarly found the absence of a severe burden on analogous facts. In *Common Sense Party v. Padilla*, 2020 WL 3491041 (E.D. Calif. June 26, 2020), the court held that a California requirement for a new party to obtain 68,180 signatures did not impose a severe burden on ballot access during the pandemic. Referring to the period of imposition of the California stay at home order, the court pointed out that the plaintiffs "have had almost one year from the time they indicated their intent to qualify for the March 2020 ballot to secure the necessary registrations," and concluded that, "[i]n context, a short window where in-person solicitation may not have been permitted does not qualify as a severe burden." *Id.* at *6.

The court also emphasized the plaintiffs' delay in filing suit: "[i]ndeed, they waited some two months to even initiate this action to challenge [the signature requirement statute] itself. If in-person solicitation was so instrumental to Plaintiffs' success, it seems they would have filed their challenge immediately rather than waiting so long during such a critical time in their campaign." *Id.; see also Lyons v. City of Columbus*, 2020 WL 3396319, *5-6 (S.D. Ohio June 19, 2020) (finding doctrine of laches barred claims in suit not filed until June 17, 2020, when emergency orders issued on March 12, 2020 and plaintiffs chose to seek other means of redress in the interim period). Similar to the Connecticut decision, the situation and requirements in California differ in some ways from New Hampshire, but the underlying points remain sentient: the plaintiffs have had a lengthy period in which to gather signatures, at most a short interruption in that period, and they waited months to file suit at their own peril.

16. In short, as a matter of fact and analogous law, the plaintiffs fall well short of proving a likelihood of success on the merits of their severe burden claim. That alone precludes the preliminary injunction they seek. For the reasons articulated in the State's objection, moreover, the plaintiffs cannot meet the other elements of proof for entitlement to a preliminary injunction.

WHEREFORE, the State respectfully requests that this Court:

A. Deny the motion for preliminary injunction; and

B. Grant such further and other relief as this Court deems just, equitable and proper.

Respectfully submitted,

CHRISTOPHER T. SUNUNU,
GOVERNOR OF THE STATE OF NEW
HAMPSHIRE, AND

WILLIAM GARDNER, NEW HAMPSHIRE
SECRETARY OF STATE

By their attorneys,

GORDON J. MACDONALD
ATTORNEY GENERAL

July 20, 2020

*/s/ Daniel E. Will*
Daniel E. Will, Bar #12176
Solicitor General

*/s/Laura E. Lombardi*
Laura E. Lombardi, Bar #12821
Senior Assistant Attorney General

New Hampshire Department of Justice
Office of the Attorney General
33 Capitol Street, Concord, NH 03301-6397
(603) 271-3650

## CERTIFICATE OF SERVICE

I, Daniel E. Will, hereby certify that a copy of the foregoing surreply to plaintiffs' reply to objection to plaintiffs' emergency verified motion for temporary restraining order and preliminary injunction was sent via the court's e-filing system to Jonathan Meyer, Esquire, counsel for the Plaintiffs.

July 20, 2020

*/s/ Daniel E. Will*
Daniel E. Will