UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Libertarian Party of New Hampshire, et al.

     v.

Christopher T. Sununu,
Governor of the State of New Hampshire,         Civil No. 20-cv-688-JL
in his official capacity,                  Opinion No. 2020 DNH 133

     and

William M. Gardner,
Secretary of State of the State of New Hampshire,
in his official capacity.

## MEMORANDUM ORDER

This action for relief from New Hampshire's ballot-access requirements, see N.H. Rev. Stat. Ann. § 655:42, turns on whether those requirements, as applied, constitute a burden on the plaintiffs' access to the ballot that outweighs the State's interests in light of the COVID-19 pandemic. The plaintiffs—the Libertarian Party of New Hampshire and its candidates for President, Vice President, United States Senator, United States Representative, and Governor of New Hampshire—seek a declaration that the state-law requirement that they obtain a certain number of nomination signatures in order to appear on the general-election ballot in November violates their rights under the First Amendment. See 28 U.S.C. §§ 2201, 2202. The plaintiffs allege they have been unable to collect the requisite number of nomination signatures given the health risks posed by the COVID-19 pandemic, social distancing concerns, and the Governor's emergency orders instructing New Hampshire residents to stay at home when possible and to not engage in close physical contact outside of residents' family groups. They thus seek a preliminary injunction, see Fed. R. Civ. P. 65, ordering the Secretary of State to place the Libertarian

Party candidates on the New Hampshire November 3, 2020 general-election ballot or to reduce the required number of nomination papers for each position be reduced by some percentage.[1]

The State of New Hampshire,[2] represented by the New Hampshire Attorney General's Office, opposes the plaintiffs' preliminary request for injunctive relief. It argues that no state action has impacted the ability of the Libertarian Party and its candidates to obtain the requisite signatures. Specifically, it argues that the plaintiffs had ample opportunity to collect the requisite signatures between January 1, 2020—when candidates could begin collecting signatures—and mid-March 2020—when the Governor declared a state of emergency—but failed to meaningfully engage in collection activity during that time period, and that the plaintiffs' have had such an opportunity following the expiration of the Governor's Stay-at-Home Orders in mid-June. As such, it contends the plaintiffs cannot demonstrate likelihood of success or any risk of irreparable harm to their First and Fourteenth Amendment rights—two required elements for the preliminary relief the plaintiffs seek.

This court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). It held an evidentiary hearing via videoconference on July 22 and 24, 2020, during which three witnesses testified. Based on the evidence presented during the hearing, the court concludes that the State's interest in enforcing its ballot-access laws requiring a set number of signed nomination papers does not outweigh the significant burden that those requirements impose on the plaintiffs'

---

[1] See Amended Compl. (doc. no. 2) at 7; Plaintiffs' Reply (doc. no. 14) at 14–15.

[2] The plaintiffs have sued both the Governor and the Secretary of State in their official capacities.

access to the ballot under the conditions created by the COVID-19 pandemic, including those instituted by the Governor's Stay-at-Home and Safer-at-Home Orders. Because the plaintiffs have thus demonstrated a likelihood of success on the merits and irreparable harm, and because the other preliminary-injunction factors also weigh in favor of an injunction, the court grants the plaintiffs' motion for a preliminary injunction and orders a 35% reduction in the number of nomination papers required of Libertarian Party candidates to appear on the general-election ballot.

## I.    **Background**

The following background is drawn from the parties' joint statement of undisputed facts and, where specifically indicated, evidence submitted before or during the court's preliminary injunction hearing.

### A.    **New Hampshire's ballot-access laws**

"New Hampshire provides potential candidates with three avenues to placement on the general election ballot." Libertarian Party v. Gardner, 638 F.3d 6, 10 (1st Cir. 2011) ("Gardner I"); see also Libertarian Party v. New Hampshire, 154 N.H. 376, 378–80 (2006) (discussing the ballot scheme).

> First, a candidate may be placed on the ballot as the nominee chosen in the primary of a state recognized "party." A "party" is defined as a "political organization which at the preceding state general election received at least 4 percent of the total number of votes cast for any one of the following: the office of governor or the offices of United States senators."

> Second, a candidate may be placed on the ballot as the nominee of a state recognized "political organization." A political organization may gain state recognition and "have its name placed on the ballot for the state general election by submitting the requisite number of nomination papers." It must submit "the names of registered voters equaling 3 percent of the total votes cast in the previous state general election."

Third, as an alternative to nomination by party or political organization, "a candidate may have his or her name placed on the ballot for the state general election by submitting the requisite number of nomination papers."[3]

Gardner I, 638 F.3d at 10 (quoting N.H. Rev. Stat. Ann. §§ 652:11, 655:42, 655:40). To be placed on the ballot via the third route, a candidate must both file a declaration of intent with the Secretary of State between certain dates in June of the year of the election, N.H. Rev. Stat. Ann. §§ 655:14-a, 655:43, II,[4] and collect a defined number of nomination papers. Candidates for President, United States Senator, or Governor must submit nomination papers signed by 3,000 registered voters, including 1,500 from each of New Hampshire's congressional districts. N.H. Rev. Stat. Ann. § 655:42, I.[5] Candidates for United States Representative must submit 1,500 nomination papers signed by registered voters from that district. N.H. Rev. Stat. Ann. § 655:41, II.[6] Candidates for Councilor or State Senator must submit 750 nomination papers and candidates for state representative or county officer 150 nomination papers. Id.

The Libertarian Party candidates in this action seek individual ballot access through the third avenue—the collection of nomination papers. Under N.H. Rev. Stat. Ann.

---

[3] See also Statement of Undisputed Facts (doc. no. 16) ¶¶ 1–3.

[4] The individual plaintiffs that were required to file declarations of intent did so. See New Hampshire Secretary of State, 2020 Election Information, https://sos.nh.gov/2020ElecInfo.aspx (last visited July 28, 2020). There is no separate ballot line for Vice President, so Vice-Presidential candidate Spike Cohen will appear on the ballot if Presidential candidate Jo Jorgensen qualifies. According to the LPNH's website, four candidates who have filed declarations of intent for General Court and county offices are affiliated with the Party. See Libertarian Party of New Hampshire, 2020 Candidates, https://lpnh.org/2020-candidates/ (last visited July 28, 2020).

[5] Undisputed Facts ¶ 2.

[6] Undisputed Facts ¶ 3.

§ 655:40, nomination papers "shall contain the name and domicile of the candidate, the office for which the candidate is nominated, and the political organization or principles the candidate represents," and "shall be signed by such persons only as are registered to vote at the state general election."[7] Id. Additionally, the statute prescribes other requirements for such papers. For example, "[n]o voter shall sign more than one nomination paper for each office to be voted for, and no nomination paper shall contain the names of more candidates than there are offices to be filled. Each voter shall sign and date an individual nomination paper.[,]"[8] and "[n]omination papers shall be dated in the year of the election." Id.

Once collected, each nomination paper must be "submitted to the supervisors of the checklist of the town or ward in which the signer is domiciled or registered" for a certification as to "whether or not the signer is a registered voter in said town or ward." N.H. Rev. Stat. Ann. § 655:41, I. The nomination papers must be "submitted to the supervisors of the checklist no later than 5:00 p.m. on the Wednesday 5 weeks before the primary," id., which is held "on the second Tuesday in September in every even-numbered year."[9] N.H. Rev. Stat. Ann. § 653:8. This year, the New Hampshire primary for the 2020

---

[7] See also Undisputed Facts ¶ 4.

[8] But a nomination paper may list candidates for multiple offices, so a voter could sign one nomination paper nominating all of the state-wide Libertarian candidates and the relevant Libertarian candidate for United States Representative. See Undisputed Facts ¶ 9.

[9] "Nomination papers must be certified by the supervisors of the checklist of the town or ward where the signer is a registered voter and accepted by the Secretary of State." Undisputed Facts ¶ 5. The supervisors of the checklist must complete their certification by the Wednesday two weeks before the primary and candidates must file all certified nomination papers with the Secretary of State by the Wednesday one week before the primary. N.H. Rev. Stat. Ann. §§ 655:41, 655:43, I. This year, those deadlines are August 26 and September 2, respectively.

General Election will occur on September 8.  As such, potential candidates have "from January 1, 2020 until August 5, 2020 to submit nomination papers" to the supervisors of the checklist.[10]

## B.    The Libertarian Party of New Hampshire's ballot access in prior years

The LPNH has had a presence in New Hampshire electoral politics for nearly 50 years.[11]  It has placed candidates for state-wide office on the general-election ballot since 2008.[12]  For most election cycles, Libertarian Party candidates achieved individual ballot access by securing nomination papers with the help of volunteers and paid solicitors.[13]  They have done so by, among other things, canvassing outside of large local events, staffing petition tables at public events, and door-to-door canvassing.

In 2009, New Hampshire amended its ballot-access laws to require that nomination papers for candidates be signed during the same year as the general election.  See N.H. Rev. Stat. Ann. § 655:40.  In 2012, the LPNH successfully collected enough nominating papers as a "political organization" to place its candidates on the ballot.  But in 2014, New Hampshire adopted the same-year requirement for "political organization" nomination papers, too, effectively reducing the period for obtaining signatures from 21 months to seven months.  Libertarian Party v. Gardner, 126 F. Supp. 3d 194, 196 (D.N.H. 2015) ("Gardner II").  The LPNH—attempting to secure a place on the ballot as a "political

---

[10] Undisputed Facts. ¶ 10.

[11] See Plaintiffs' Proposed Finding of Fact (doc. no. 20) ¶ 1.  According to its gubernatorial candidate, Darryl Perry, the Libertarian Party has placed candidates on the ballot in New Hampshire "fairly consistently since the mid-1970s, with a couple of exceptions."

[12] Id. ¶ 2.

[13] Id. ¶¶ 4-5.

organization"—challenged those amendments as an impermissible ballot restriction, arguing that the new law compressed the collection window to an impermissibly short period, which was rendered even shorter by New England's harsh winter months, during which—it argued—in-person signature collection was impractical.  Id. at 201-03.

The court rejected those arguments in light of evidence demonstrating the LPNH's ability to collect signatures during winter and ample authority from the Supreme Court and Court of Appeals upholding more restrictive ballot-access laws.  Id.  The court thus concluded that New Hampshire's signature-gathering requirements did not impose a severe burden on the LPNH's access to the ballot and did not, therefore, infringe its First Amendment Rights.  Id. at 206.  The First Circuit Court of Appeals affirmed, likewise rejecting the LPNH's arguments that the narrowed period imposed a severe burden on its candidates' access to the ballot.  Libertarian Party v. Gardner, 843 F.3d 20, 29 (1st Cir. 2016) ("Gardner III").

**C.    New Hampshire's response to the COVID-19 pandemic**

On March 13, 2020, Governor Christopher Sununu—named, in his official capacity, as a defendant in this action—declared a state of emergency in New Hampshire due to the novel coronavirus colloquially known as COVID-19.[14]  That state of emergency has remained in effect to the present.[15]

---

[14] Undisputed Facts ¶ 13.

[15] Id. ¶ 14.

Following that declaration, the Governor issued a series of Emergency Orders as the state responded to the COVID-19 crisis.[16] On March 23, 2020, the Governor issued Emergency Order Number 16, prohibiting scheduled gatherings with ten or more attendees. Three days later, Governor Sununu issued Emergency Order Number 17, known as the "Stay-at-Home Order."[17] This Order closed non-essential businesses and required New Hampshire residents to stay at home unless engaged in certain activities identified in the order. Those restrictions were not lightened until May 1, 2020, when the Governor issued Emergency Order Number 40—also known as "Stay-at-Home 2.0"— which permitted certain non-essential businesses to begin reopening under guidelines designed to minimize adverse health impacts on the public.

The Stay-at-Home Order expired some six weeks later on June 15, 2020 and was replaced the next day by Emergency Order Number 52, known as the "Safer-at-Home Order."[18] That Order advised continuing the restrictions imposed under Stay-at-Home 2.0, but imposed no limits on social gatherings and did not distinguish between essential and non-essential businesses.

**D.     The plaintiffs' complaint and emergency motion**

Recognizing that COVID-19 may affect its ability to collect enough signatures to appear on the 2020 ballot, the LPNH sought to mitigate its effects. In April 2020, the LPNH began contacting the Secretary of State, the Governor, and the New Hampshire

---

[16] All of the Governor's Executive Orders and Emergency Orders issued thereunder are available online at https://www.governor.nh.gov/news-and-media/emergency-orders-2020.

[17] Id. ¶ 15. The order took effect March 27, 2020.

[18] Id. ¶¶ 18–19.

Department of Justice, requesting that the Libertarian Party candidates be placed on the ballot without collecting and submitting the requisite number of nominating papers, because of the burdens on signature gathering imposed by the pandemic. The Department of Justice responded that it lacked the authority to compel a legal change and the LPNH claims that it received no direct response from the Governor or the Secretary of State. It learned that the Governor had denied its request during a May press conference on the State's health developments.

The plaintiffs filed their complaint in this action on June 8, 2020, and amended it the next day.[19] They also moved for a temporary restraining order and preliminary injunction,[20] specifically seeking an order requiring the Secretary of State to "place the [p]laintiffs on the New Hampshire November 3, 2020 general election ballot . . . ."[21] The court denied the motion for a temporary restraining order three days later, as the plaintiffs failed to demonstrate "irreparable harm if immediate temporary injunctive relief [was] not granted without notice to adverse parties," see Fed. R. Civ. P. 65(b)(1)(A), but did so "without prejudice to eventual injunctive relief in an appropriate procedural posture."[22]

On June 24, the court held a status conference over its videoconferencing platform to discuss the contours of an evidentiary hearing on the plaintiffs' preliminary relief motion. The parties agreed that the motion did not necessitate an in-person hearing,

---

[19] Compl. (doc. no. 1); Amended Compl. (doc. no. 2).

[20] Plaintiffs' Mot. for TRO and Prelim. Injunction (doc. no. 4).

[21] Plaintiffs' Mem. in Supp. of Mot. for TRO and Prelim. Injunction (doc. no. 4-2) ("Plaintiffs' Mem."); Plaintiffs' Proposed Order (doc. no. 4-3).

[22] June 11, 2020 Endorsed Order.

considering the court's standing orders imposing limits on the availability of in-person hearings.[23]  As part of its standing practice, the court ordered the parties to submit a joint statement of undisputed facts, individual proposed findings of fact and rulings of law, witness lists, and proposed exhibits in advance of the scheduled evidentiary hearing—and counsel dutifully complied.

The evening before the preliminary injunction hearing, the plaintiffs moved to consolidate that hearing with a final hearing on the merits its claims.[24]  When asked during the hearing, the defendants' counsel declined to take an immediate position on this motion. The defendants' deadline to object or otherwise respond to this motion is August 11, 2020.

**E.   The preliminary injunction hearing**

The court held a hearing on the plaintiffs' motion by videoconference over two days, on July 22 and 24, 2020.  The plaintiffs called three witnesses in support of their motion:  Libertarian Party candidate for Governor of New Hampshire, Darryl Perry, and New Hampshire's United States Senate seat, Justin O'Donnell, as well as Secretary of the LPNH, Jilletta Jarvis.[25]  The LPNH witnesses' testimony focused on:  (1) the efforts the LPNH made and had planned to make to collect signatures before the Governor declared a state of emergency on March 13 and issued the Stay-at-Home Order on March 26; (2) the LPNH's efforts that were cancelled as a result of the Stay-at-Home Orders in effect between March 27 and June 15 and its efforts to collect signatures remotely as a result;

_____

[23] E.g., Orders 20-7 (March 23, 2020) and 20-25 (July 24, 2020).

[24] Plaintiffs' Mot. to Consolidate (doc. no. 24).

[25] Jarvis testified that as Secretary, she is the "informal" hub for the signature-process, responsible for collecting all nomination papers, separating and counting ballots by town, sending papers to town authorities, and communicating error trends in papers received.

(3) the LPNH's efforts to collect signatures under the Governor's Safer at Home order in effect from June 16 to the present; and (4) the actions that the LPNH took to mitigate the effect of these orders and the COVID-19 pandemic on its signature-collection efforts. The State cross-examined these witnesses but presented no witnesses of its own.

## 1.      Initial efforts: January and February 2020

As discussed supra, the Libertarian party nominees for President, Governor, and United States Senate (plaintiffs Jo Jorgenson, Darryl Perry, Justin O'Donnell, respectively) each must submit 3,000 signed nomination papers in order to appear on the ballot.[26]  Plaintiffs Andrew Olding and Zack Dumont—the Libertarian Party nominees for the United States House of Representatives—in turn, must submit 1,500 signed nomination papers.[27]  According to Secretary Jarvis, the LPNH aims to collect twice the required number of petitions because approximately half of the petitions received contain name or address information that differs from the voter's registration, rendering the petition invalid.[28]  In 2016, she testified, approximately 2,000 signatures of the 5,000 to 6,000 petitions collected were deemed invalid.

In January, the LPNH began collecting signatures for its candidates nominated during its January nominating convention, including its candidates for Governor of New Hampshire, United States Senator, and United States Representatives.  Secretary Jarvis testified that, though the LPNH collected some signatures for presidential and vice-

---

[26] Undisputed Facts ¶ 7.

[27] Id. ¶ 8.

[28] A petition will also be invalid if the voter signed a nomination paper submitted on behalf of a competing candidate for the same office.

presidential candidates earlier in the year, it planned to focus on collecting those signatures after those candidates were nominated at the Libertarian Party National Convention, held virtually this year, on May 23-24.

The LPNH collected approximately 375 signatures during January and February, primarily at voting locations on the day of New Hampshire's primary election on February 11, 2020.[29] Gubernatorial candidate Perry, who was nominated as the gubernatorial candidate at the LPNH convention in January, also began soliciting nomination papers at local conventions, such as the New Hampshire Liberty Forum, and through emails sent to a list of supporters. He testified that he obtained approximately 100 signatures in January by himself and with the aid of a handful of volunteers.

United States Senate candidate O'Donnell also began soliciting petitions in January after accepting his nomination, though he testified that his efforts were limited by seasonal time conflicts posed by his work as a health insurance consultant. He relied on other Libertarian Party members to collect signatures between January and March, with limited success, at local events in New Hampshire such as regularly held "market days" in Manchester and the presidential primary.

## 2.      Cancelled efforts: March 2020 to June 2020

All of the LPNH's witnesses testified, consistent with the agreed-upon facts, that the Party intended to focus its signature-gathering activities in the spring and summer months—after the National Convention in May and when the weather improved.[30] Historically, as its witnesses testified, Libertarian Party candidates primarily used in-

---

[29] Id. ¶ 11–12.

[30] See id. ¶ 17.

person methods to gather signatures, including canvassing tables outside of retail establishments, door-to-door canvassing, staffing petition tables at public events, and securing petition signatures through mailings and emails. But the Center for Disease Control reported the first possible case of community spread of COIVD-19 in the United States on February 26, 2020[31] and by March 26, 2020 the Governor had issued the Stay-at-Home Order,[32] interrupting plans to engage in in-person signature-collecting efforts.

The LPNH contends that their efforts to collect signatures on nomination papers have been substantially less successful than in past election cycles because of the COVID-19 pandemic. Specifically, the LPNH claims to have faced five pandemic-related obstacles:

- Justified health concerns of voters about engaging with solicitors at their homes or in front of retail establishments due to concern about the infection nature of COVID-19 and the Governor's [Stay-at-Home Order].

- The cancellation of almost all large and medium scale [public] events since March.

- The reluctance of retail establishments since the start of the pandemic to have solicitation tables located on their properties.

- [The closure] of non-essential businesses between March 16, 2020 and June 15, 2020.

- The health concerns of potential solicitors, both volunteered and paid.[33]

---

[31] Center for Disease Control, "CDDC Confirms Possible Instance of Community Spread of COVID-19 in the U.S." (Feb. 26, 2020), available at https://www.cdc.gov/media/releases/2020/s0226-Covid-19-spread.html.

[32] Undisputed Facts ¶ 15.

[33] Plaintiffs' Proposed Finding of Fact ¶ 9.

As a result of these obstacles, the LPNH claims that its collection activities have been approximately 25% as successful as in past election cycles.[34]

The witnesses all testified consistently that the COVID-19 outbreak and the Governor's Stay-at-Home Order significantly impacted their and the LPNH's ability to collect signatures in person, which was the method they believed to be most successful. For example, Perry originally planned on attending town festivals, town meetings, town "market days," and local fairs throughout New Hampshire before most of these events were canceled due to the pandemic and the State's Stay-at-Home Orders. He also testified that he planned to solicit signatures outside of events held at SNHU Arena, including a state hockey championship and a visit by the Harlem Globetrotters—but these events have also been cancelled, either in response to the Governor's orders or in light of continued safety precautions. Secretary Jarvis also testified that LPNH was planning to set up tables at local events throughout the spring, which have also been cancelled.

They also testified that concerns for their own health, their families', and their clients' prevented them from soliciting signatures in person. For example, Perry testified that he has refrained from doing so this spring and summer out of concern for the health of his wife, who is high-risk for COVID-19 complications, and because he believed such efforts remained impracticable, even conducted with proper safety precautions and after the State relaxed restrictions. After the State declared a state of emergency, O'Donnell attended the "first reopen rally held in Concord at the statehouse," but was unable to obtain signatures after, as he put it, discovering that "it was a partisan campaign rally for

---

[34] Id. ¶ 10.

14

President Trump," and that its attendees were disinclined to support a third-party candidate. He did not return to later rallies for the same reason, and because, in his view, many attendees were not taking the risk of community spread seriously. He further abstained from most in-person petitioning activities during the Stay-At-Home-Order period out of concern for the health of his clients, the majority of whom, he testified, were over the age of 65 with significant health risks.

Secretary Jarvis testified about how the outbreak of COVID significantly reduced the LPNH's ability to collect signatures. She represented that, though LPNH relied on in-person petitioners in the past, this year it had lost about of half its petitioners due to the health risks associated with in-person contact. Though the LPNH has the funds to hire canvassers, Secretary Jarvis testified that several of its advertised, outstanding petition-gathering positions remain unfulfilled and professional soliciting companies are spread around the country and difficult to engage at this stage in the campaign season.

The witnesses consistently testified that their efforts to reach out to voters via mail, email, and other remote means met with little success. For example, Perry testified that he primarily solicited signatures virtually during this time period, through posts on his social medial accounts and emails to his supporters, as well as through usual campaign activities such as virtual Town Hall events held every Thursday. But, he testified, he had little success through these methods.

O'Donnell testified that, though he sent mailers to about 150 historical Libertarian Party donors with prepaid, return envelopes, he received only seven completed petitions in return. Secretary Jarvis similarly testified that the LPNH's efforts to reach out by mail or email have not succeeded. For example, she testified that, when one of its candidates set

up an email campaign and sent email solicitations to between 500 and 1,000 email addresses, only 8 people responded.

**3.      Safer at Home efforts: June 2020 to the present**

The Governor's Stay-at-Home Orders expired on June 15, 2020 and, the next day, he issued the Safer-at-Home Order, loosening restrictions on gatherings and merely advising that people continue to take relevant precautions to prevent the community spread of COVID-19.  The LPNH increased its efforts to obtain signatures on nomination papers in person after the Stay-at-Home Orders expired but, according to all three witnesses, has found these efforts less fruitful than in past years due to concerns about infection and social-distancing norms.

For example, after this transition, the LPNH permitted volunteers and its five or six paid canvassers to engage in in-person petitioning.  Its remaining volunteers have been going door-to-door to collect petitions.  But these in-person collection efforts have been less effective than in past years.  According to Secretary Jarvis, petitioners are obtaining about 40 signed petitions per day, in contrast to the nearly 40 signed petitions the LPNH typically collected per *hour* during prior election cycles.  In an effort to obtain signatures while still respecting concerns and social-distancing norms, she has been arranging "pick up days" in which she personally picks up petition forms printed and signed by voters at their homes.  Most voters, she testified, are unwilling to talk to them or exchange papers because of social distancing and infection concerns.  The LPNH waits at least 24 hours after receiving petitions before touching and removing invalid petitions, given the risk of community-spread infection.

After the Stay-at-Home Orders lifted, the LPNH also contacted regional grocery chains for permission to set up tables outside of grocery stores. Only the Market Basket chain agreed. During the Fourth of July weekend, the LPNH set up a table outside of the Market Basket in Bedford from approximately 10:00 a.m. to 5:00 or 6:00 p.m. on both Saturday and Sunday. Though the table was staffed by paid canvassers, Secretary Jarvis testified that the LPNH secured only 421 signed petitions over those two days. The LPNH has also set up tables outside of several other Market Basket stores throughout the state, with much the same effect. On July 11, local police even confronted LPNH petitioners outside the Somersworth Market Basket store for possible violations of social distancing.

During this same timeframe, O'Donnell began in-person petitioning with the financial assistance of the LPNH. For example, O'Donnell has set up tables to collect signatures outside Market Basket stores in the Nashua and Manchester areas, as well as in Swansea, where he obtained about 50 petitions. However, according to O'Donnell, obtaining signatures in person during the Safer at Home period remained difficult in light of the need to follow social distancing protocols. He found it more difficult to stop people entering and leaving the store when he had to maintain distance from them, that fewer people would stop to interact with him, and that even fewer would sign because they did not want to touch the pens or papers he provided. He also testified that a lisp made it more difficult for him to communicate through a mask, increasing the time of each interaction. He estimated that he could obtain at most 35 petitions per day on weekdays and 65 to 80 petitions on weekend days in this manner. And even though the Stay-at-Home Order has expired, many popular local events—such as community days and pride

parades, which he viewed as efficient avenues for obtaining nomination signatures—have been cancelled.

**4.      Status as of the preliminary injunction hearing**

Before the State's Stay-at-Home Orders, the LPNH collected approximately 375 signatures on nomination papers, primarily at voting locations on February 11, 2020, the day of the New Hampshire Democratic and Republican Party primaries.[35]  As of July 7, 2020, the LPNH had gathered 803 nomination papers for state candidates and 426 for federal candidates.[36]  Prior to the hearing, the LPNH represented that its collection activities have been approximately 25% as successful as in past election cycles.[37]

As of the hearing date, according to Secretary Jarvis, the LPNH had collected 2,543 nomination petitions for state candidates and 2,056 petitions for the Libertarian Party federal candidates.  The bulk of these positions were submitted by voters in New Hampshire's first congressional district—specifically, nearly 1,750 of the state-candidate petitions were signed by voters from New Hampshire's First District versus about 800 petitions signed by voters from New Hampshire's Second District.  For the federal candidates, Secretary Jarvis reported that the LPNH had approximately 1,400 petitions from the First District and 665 petitions from the Second District.  As of the hearing, at best the LPNH was obtaining approximately 350 signed petitions per week in July.

By comparison, in the 2011–2012 election cycle, the LPNH spent roughly $40,000 to collect approximately 19,000 total signatures between July 2011 and August 2012 as

---

[35] Undisputed Facts ¶ 12.

[36] Id. ¶ 21.

[37] Plaintiffs' Proposed Finding of Fact ¶ 10.

part of a "political organization" ballot initiative.  Gardner II, 126 F. Supp. 3d at 197–198.

Approximately 13,787 of these signatures were gathered during the short period between

August 1 and September 23, 2011, "the vast majority of which were collected by . . . paid

petitioners, who charged anywhere from $1 to $2 per signature."  Id.  After September

2011, the LPNH aimed to finish its petition drive by relying on volunteers supplemented

by paid petitioners that it could afford with its remaining, limited resources, but the

strategy met with limited success.  Id.  "Between roughly September 2011 and late July

2012, LPNH collected only about 5,000 additional nomination papers."  Id.  1,700 of these

signatures were gathered on a single day in July 2012, around the Fourth of July holiday.

Gardner III, 843 F.3d at 29.

## II.    **Analysis**

The plaintiffs seek the "extraordinary and drastic remedy" of a mandatory,

preliminary injunction ordering the Secretary of State to place the Libertarian Party

candidates on the 2020 General Election Ballot or, in the alternative, to reduce the number

of signatures required for placement on the ballot by some percentage.  See Munaf v.

Geren, 553 U.S. 674, 689–90 (2008) (citations omitted).  A mandatory preliminary

injunction "requires affirmative action by the non-moving party in advance of trial."

Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 41 (1st Cir. 2010).  And

because it "alters rather than preserves the status quo, it 'normally should be granted only

in those circumstances when the exigencies of the situation demand such relief.'"  Id.

(quoting Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency, 649 F.2d 71, 76

n.7 (1st Cir. 1981)).

In deciding whether to grant a preliminary injunction, the court considers the familiar four factors:

> the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of injunctive relief; the balance of [relative] hardships, that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and the effect, if any, that an injunction [or the lack of one] may have on the public interest.

CVS Pharmacy, Inc. v. Lavin, 951 F.3d 50, 55 (1st Cir. 2020) (quotations and citations omitted). "[T]he first two factors, likelihood of success and of irreparable harm," are "the most important in the calculus." Bruns v. Mayhew, 750 F.3d 61, 65 (1st Cir. 2014) (quoting González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009)) (internal quotation marks omitted). And of those, "'likelihood of success is the main bearing wall' of this 'framework'." W Holding Co. v. AIG Ins. Co., 748 F.3d 377, 383 (1st Cir. 2014) (quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996)). The LPNH and its candidates bear the burden of proving all four preliminary injunction factors. See Esso Std. Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

As discussed below, the court finds that the plaintiffs have met this burden as to showing likelihood of success on the merits and relatedly irreparable harm, and that the competing private equities and public interests at issue weigh in favor of granting preliminary injunctive relief.

## A.    Likelihood of success on the merits

In the First Circuit, "proving likelihood of success on the merits is the 'sine qua non'"—that is, the critical element—of the test for preliminary injunctive relief. Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015)

(quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Id. (quoting New Comm, 287 F.3d at 9); accord ANSYS, Inc. v. Computational Dynamics N. Am., Ltd., 595 F.3d 75, 78 (1st Cir. 2010) ("The first factor, likelihood of success, is usually given particularly heavy weight.").

The plaintiffs have brought a single claim: They allege that their First Amendment rights to speech, petition, and association are violated by the State's ballot-access limitations, as applied to them during the COVID-19 pandemic.[38] And they contend that they are likely to succeed on the merits of this claim because those requirements, as applied under the conditions of the COVID-19 pandemic, place a severe and unconstitutional burden on the rights of the parties and candidates seeking ballot access.

The State counters that the ballot-access laws impose only a reasonable burden on ballot access and are properly tailored to the State's interest in avoiding ballot clutter, and thus do not violate the plaintiffs' rights. Further, it asserts that the current state of emergency has not transformed the burden imposed by the ballot-access regime into a severe one, which would warrant greater constitutional scrutiny.

As discussed below, the outcome of this court's constitutional merits analysis depends heavily on the challenged restrictions' factual context, as evidenced at this preliminary litigation posture. Accordingly, the court first analyzes the applicable legal standard for the plaintiffs' First and Fourteenth Amendment challenge. It then determines

---

[38] See Amended Compl. ¶¶ 34–37.

whether the State's ballot-access laws, as applied during this current COVID-19 pandemic, impose a severe or less-than-severe burden on ballot access, and whether the state interests served by the State's ballot-access laws are sufficient to sustain them against the LPNH's challenge.  It ultimately concludes that the State's interests served by the challenged ballot-access laws do not outweigh the burden they impose on the plaintiffs' access to the ballot under the conditions created by the COVID-19 pandemic, including those instituted by the Governor's Stay-at-Home and Safer-at-Home Orders.  The LPNH has therefore demonstrated that it is likely to succeed on the merits of its claim.

### 1. The First- and Fourteenth-Amendment interests

Ballot-access restrictions implicate "'two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively,' thereby triggering scrutiny under both the First and Fourteenth Amendments." Gardner III, 843 F.3d at 25 (quoting Williams v. Rhodes, 393 U.S. 23, 30 (1968)).  Ballot-access restrictions affect candidates and individual voters alike because, absent recourse to state-wide proposals or referenda, "voters can assert their preferences only through candidates or parties or both. . . . The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." Gardner II, 126 F. Supp. 3d at 199 (quoting Anderson v. Celebrezze, 460 U.S. 780, 787 (1983)).  Moreover, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." Anderson, 460 U.S. at 786 (quoting Bullock v. Carter, 405 U.S. 134, 143 (1972)).

"At the same time, states have a strong interest in conducting orderly elections." Gardner II, 126 F. Supp. 3d 194. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer v. Brown, 415 U.S. 724, 730 (1974). "Each provision of [a state's election code], whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." Anderson, 460 U.S. at 788. "Nevertheless, the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." Id. See also U.S. Const. Art. I, § 4, cl. 1 (the States may prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives").

To balance these competing interests, "the Supreme Court has developed a flexible sliding scale approach for assessing the constitutionality of [ballot-access] restrictions"—commonly referred to as the Anderson-Burdick framework. Barr v. Galvin, 626 F.3d 99, 109 (1st Cir. 2010) (internal quotation omitted). Under this framework:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. . . . Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson, 460 U.S. at 789.

"The outcome of this analysis depends heavily on the challenged restriction's factual context." Gardner II, 126 F. Supp. 3d at 200 (citing Anderson, 460 U.S. at 789).

An election law that imposes a "severe" restriction on voters' rights cannot survive unless it is "narrowly drawn to advance a state interest of compelling importance." Burdick v. Takushi, 504 U.S. 428, 434 (1992) (internal quotation omitted). This analysis is commonly referred to as "strict scrutiny." See id. at 433. Regulations that do not severely burden a plaintiff's rights require only "the demonstration of a corresponding [state] interest sufficiently weighty to justify the limitation." Norman v. Reed, 502 U.S. 279, 288–89 (1992); see Anderson, 460 U.S. at 788.

"[S]ome courts applying Anderson have compared the middle range of its sliding scale to 'intermediate scrutiny.'" Gardner III, 843 F.3d at 31 (citing Guare v. State, 167 N.H. 658 (2015)). In a case concerning the signature requirements for Michigan's congressional primary ballot, a trial court in the Sixth Circuit very recently described this test for "[r]egulations falling somewhere in between—i.e., regulations that impose a more-than-minimal but less-than-severe burden" as requiring "a 'flexible' analysis, weighing the burden on the plaintiffs against the [s]tate's asserted interest and chosen means of pursuing it.'" [39] Esshaki v. Whitmer, 2:20-cv-10831-TGB, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020) ("Esshaki I") (quoting Ohio Democratic Party v. Husted, 834 F.3d 620, 627 (6th Cir. 2016)) (internal quotation marks omitted).

But as Judge Barbadoro observed in Gardner II:

_____

[39] That court ultimately granted a preliminary injunction and lowered the number of signatures required for candidates to be included on the primary ballot by 50% because of the Michigan governor's stay-at-home orders. Id. at *11–12. The Sixth Circuit Court of Appeals agreed, affirming the conclusion that the plaintiffs were severely burdened, though it stayed the specific remedy ordered by the District Court. Esshaki v. Whitmer, No. 20-1336, 2020 WL 2185553, at *1 (6th Cir. May 5, 2020) ("Esshaki II").

> [T]he Supreme Court has never designated any specific lesser level of scrutiny—whether rational basis, intermediate scrutiny, or any other standard of review—to analyze restrictions that do not impose severe burdens.  Instead, in Burdick v. Takushi, the Court applied Anderson balancing, rather than a discrete level of scrutiny, to a ballot-access restriction that it found to be not severe.  And in Crawford v. Marion County Election Board, a majority of the Court's members appeared to disavow the application of specific and discrete levels of scrutiny to non-severe restrictions.

126 F. Supp. 3d at 206 (citing Burdick, 504 U.S. at 434, 439–40, and Crawford, 553 U.S. 181, 191 (2008)) (other internal citations omitted); see also, Crawford, 533 U.S. at 210 (Souter, J., dissenting) (observing that the Court has "avoided preset levels of scrutiny in favor of a sliding-scale balancing analysis").  The First Circuit Court of Appeals has similarly eschewed the application of lesser, discrete levels of scrutiny.  See Gardner III, 843 F.3d at 31; Barr, 626 F.3d at 109 (emphasizing a "sliding scale" approach).  Following this guidance, the court here applies the Anderson-Burdick framework to New Hampshire's ballot-access laws without invoking any specific or discrete level of constitutional scrutiny.  Before the court weighs the burden on the plaintiffs' First and Fourteenth Amendment rights against the state's interest, it must identify that burden and those interests, which it does in the next two sections.

2.     **Burden on the right to vote**

The parties dispute how much of a burden on their access to the ballot the plaintiffs must demonstrate to show a likelihood of success on the merits, as well as whether the plaintiffs have demonstrated that burden.  The plaintiffs argue that enforcement of New Hampshire's ballot-access signature requirements during the COVID-19 pandemic imposes a severe burden on their First and Fourteenth Amendment rights—or, if not severe, at least something more than a slight burden on those rights.  The State, on the

other hand, contends that the plaintiffs <u>must</u> demonstrate a severe burden and that they have not done so, because any burden on the plaintiffs is no more than slight.

"In the end, 'there is no hard-and-fast rule as to when a restriction on ballot eligibility becomes an unconstitutional burden.'" Garbett v. Herbert, No. 2:20-cv-245-RJS, 2020 WL 2064101, at *12 (D. Utah Apr. 29, 2020) (quoting Utah Republican Party v. Cox, 892 F.3d 1066, 1086 (10th Cir. 2018)).

> Rather, the court must consider the "character and magnitude" of the injury in view of the statutory framework as a whole, the practical effect of the election laws, and the available avenues to the ballot. And because [Plaintiffs] bring[ ] an as-applied challenge, the court must consider [their] injury under the unique circumstances related to the COVID-19 pandemic.

Id. (quoting Cox, 892 F.3d at 1077, 1088). As explained more fully below, the court concludes that the challenged ballot-access laws do not impose a severe burden on the plaintiffs' access to the ballot; but the plaintiffs need not demonstrate a severe burden to obtain relief. Enforcement of those laws would impose more than a slight burden on the plaintiffs in light of the COVID-19 pandemic, the State's ensuing Stay-at-Home and Safer-at-Home orders, and the social conditions operative in New Hampshire even after the expiration of the Stay-at-Home Orders.

The COVID-19 pandemic has dramatically changed life within the State of New Hampshire and the United States of America at large. As the Supreme Judicial Court of Massachusetts has described its effect on that Commonwealth:

> [D]uring the state of emergency, the traditional venues for signature collection [were] unavailable: few people [were] walking on public streets in town centers; malls [were] closed, as [were] all but essential businesses; restaurants provide[d] only take-out food or delivery; public meetings, if held at all, [were] conducted virtually; and the vast majority of people [were] remaining at home. . . . .

Goldstein v. Sec'y of Commonwealth, 142 N.E.3d 560, 570 (Mass. 2020).  New

Hampshire's experiences have paralleled those of its southern neighbor.  As explained

supra, beginning in March 2020, Governor Sununu issued emergency orders closing non-

essential businesses and instructing New Hampshire residents to either stay at home or,

when required, to maintain a social distance from members of the public of at least six

feet.  These emergency orders were premised on the finding that COVID-19 is commonly

spread through close, community contact.

       And even though the Stay-at-Home orders have expired, life has not returned to

"normal."  New Hampshire residents, while more frequently leaving their homes, remain

cautious and vigilant.  "When people do encounter each other, they [likely] do so only by

maintaining a 'social distance' of at least six feet, and attempt to keep such encounters as

brief as possible."  Id.  While, with time, the community has learned more about the novel

coronavirus, it is still discovering new things about the virus's nature and how it spreads

among the ever-moving parts of modern society.

       Last month, Judge McElroy reached similar conclusions about the pandemic's

current effect on society before entering a preliminary injunction reducing Rhode Island's

statutory ballot-access signature requirement during the pandemic.  See Acosta v. Pablo

Restrepo, No. 1:20-cv-00262-MSM-LDA, 2020 WL 3495777, at *5 (D.R.I. June 25,

2020).  Six candidates for the Rhode Island Senate had argued that the mid-pandemic

enforcement of Rhode Island's ballot-access laws—which required candidates to obtain

100 "wet" signatures from registered voters residing in their senatorial district by July

10—"'needlessly exposes[d] candidates, their supporters, and the general public to risks

associated with the COVID-19 pandemic with no justifiable countervailing interest.'"  Id.

at *3 (quoting the plaintiffs' brief). Judge McElroy agreed. In her words: "[a]lthough some restrictions in Rhode Island now have been relaxed, some sectors of the economy have been reopened, and the number of infections in the state has declined, current Rhode Island Department of Health regulations still require 'social distancing' of six feet, and emphasize 'minimiz[ing] the time of exposure to the extent possible.'" Id. at *2. "While [the objecting defendants] are correct that the rate of infection in Rhode Island has decreased from its peak, and that the state has begun its reopening process, these developments can be attributed to social distancing measures and the avoidance of the type of personal contact that the signature collection process requires." Id. at *5.

Likewise, in Constitution Party of Va. v. Va. State Board of Elections, a district court found that enforcement of Virginia's signature requirements in the current health environment made "it almost impossible for the plaintiffs"—various independent candidates—"to get on the ballot." No. 3:20-cv-349, 2020 WL 4001087, at *5–6 (E.D. Va. July 15, 2020). Like New Hampshire, the Virginia governor, "Governor Northam[,] issued a stay-at-home order effective [from March 30, 2020] until June 10, 2020, which limited gatherings to no more than ten individuals and implemented measures to restrict person-to-person contact." Id. at *3. The State also eased restrictions in May, and on July 1, 2020, "moved into 'Phase Three,' which continued physical distancing guidelines but increased social gathering sizes to 250 people" and opened restaurants to 100% occupancy. Id.

After a one-day bench trial, the district court found on the record before it that Virginia's signature requirements severely burdened the plaintiffs' ballot-access rights.[40] In doing so, it noted:

> The large public gatherings on which they typically rely to obtain most signatures have been cancelled. Door-to-door signature gathering presents more difficulties because the plaintiffs cannot pass clip boards with petitions to those who answer the door. . . . Many stores either have physical barricades preventing the plaintiffs from setting up tables or will not give them permission to gather signatures on the stores' premises.
>
> These difficulties—a result of COVID-19 and the Executive Orders— prevent the plaintiffs from meeting the signature requirements, thereby interfering with their ballot access.

Id. at *5. Given these factors, the court found that the Virginia's "signature requirements as applied to the plaintiffs in light of COVID-19 and the Executive Orders" made "it almost impossible for the plaintiffs to get on the ballot." Id. at *6. It thus reduced the signature requirements to 35% for plaintiffs running for Congress and to 50% for president. Id. at *7-8.

**Stay-at-home period**. Here, the plaintiffs have similarly demonstrated that "[w]ith the onset of the pandemic and the imposition of restrictions that followed," they have been limited in their ability to "safely and reasonably gather voter signatures in the usual ways, namely, going to places where large numbers of potential registered voters are likely to be, such as town centers, malls, grocery stores, or political meetings." See Goldstein, 142 N.E.3d at 568. After the Governor declared a state of emergency in March, the plaintiffs

---

[40] In Virginia, "[a]n independent or minor party candidate running for President or Vice President must collect 5,000 signatures, with signatures from at least 200 qualified voters from each congressional district." Id. at *2.

were effectively prevented from soliciting nomination papers in person. Emergency Order Number 16 issued by the Governor prohibited scheduled gatherings of ten or more attendees. And Emergency Order Number 17—the first Stay-at-Home Order—closed non-essential businesses and required New Hampshire residents to stay at home unless engaged in certain enumerated activities. These emergency orders prevented the Libertarian Party candidates from meeting the signature requirements for ballot access through traditional in-person avenues for signature collection while they were in effect— that is, until June 15. See also Goldstein, 142 N.E.3d at 570 (finding that during Massachusetts's stay-at-home period, "traditional venues for signature collection [were] unavailable: few people [were] walking on public streets in town centers; malls [were] closed, as [were] all but essential businesses; restaurants provide[d] only take-out food or delivery; public meetings, if held at all, [were] conducted virtually; and the vast majority of people [were] remaining at home").

**Safer-at-home period**. The plaintiffs have also demonstrated a continued burden on their collection efforts even after the Stay-at-Home Orders expired on June 15. The State argues that the 51-day period between June 15 and the August 5 deadline provided ample time for the plaintiffs to collect the requisite number of signatures. In doing so, it points out that the Supreme Court and First Circuit Court of Appeals have upheld similar time frames for collecting greater numbers of signatures. See Am. Party of Texas v. White, 415 U.S. 767, 786-87 (1974) (finding a 55-day period for circulating petitions in the State of Texas not "an unduly short time" for collecting 22,000 signatures); Barr, 626 F.3d at 110 (finding in the context of an equal protection challenge that 60 days to secure

10,000 required signatures imposed a "modest" burden, given other third-party candidates' ability to secure 8,000 signatures during a similar period).

But as discussed supra, even though the Stay-at-Home Orders have expired, conditions have not returned to normal. As all three witnesses testified, in-person canvassing remains difficult. The large public gatherings on which the LPNH candidates typically relied to obtain most signatures, including sporting events at SNHU Arena, town market days, gay-pride parades, and local festivals have been canceled. Canvassers and voter also remain hesitant regarding their own health concerns, the health of those around them, and the increase[d] health risks posed to both canvassers and the public. See Acosta, 2020 WL 3495777, at *5; Goldstein, 142 N.E.3d at 570. Of New Hampshire's several chain grocers, only Market Basket has allegedly consented to allowing the plaintiffs to set up tables outside of stores. When Libertarian Party candidates have set up tables at such locations, they have received, on average, lower numbers of signatures due, in part, to the safety measures adopted to reduce the risk of community spread: wearing masks, which makes communication difficult; maintaining six-feet of distance from other people, which makes it harder to stop potential signers; regularly cleaning surfaces; and dividing volunteers between canvassing duties and safety duties. And on one occasion during Safer-at-Home, local police were called by a presumably concerned citizen to a local Market Basket to investigate whether canvassers were violating social distancing guidelines for opened businesses.

The State is, of course, well aware that conditions have not yet returned to normal and in-person interactions remain affected by the pandemic. For example, Secretary of State Gardner appointed a committee to advise his office on how to spend emergency

31

election funding.[41]  Two weeks before the Stay-at-Home Order expired, this committee—called the Select Committee on 2020 Emergency Election Support—published a report finding, among other things, that:

> [A]t each stage of the Political Calendar, which has already begun, actions which normally are taken in person, are impossible or imprudent due to the effects of the virus.

> [I]n the pandemic environment, it is important to avoid in-person contacts anywhere, not just at the polls."

> Legal requirements for independent candidates and third parties to go get petition signatures are complex in normal times.  In this time of social distancing, stay-at-home orders and the like, they may make those actions impossible on a practical basis.[42]

In several press conferences around the time that the Stay-at-Home Orders expired, and afterward, Governor Sununu has acknowledged that social-distancing guidelines "will remain in place for quite some time" and are "the new normal, at least for the time being."[43]

---

[41] See Final Report of the Select Committee on 2020 Emergency Election Support (June 5, 2020), Plaintiffs' Ex. 2.  This report and its findings lack the force of law but reflect an understanding of the current situation.

[42] Id. at 14, 19, 23 (emphasis in original).

[43] See Press Statements by Governor Sununu and Commissioner Shibinette (June 11, 2020), transcript available at https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/20200611-transcript.pdf.  In later press conferences, including those held on June 17, June 25, July 1, and July 21, he has continued to encourage people in New Hampshire to practice social distancing to prevent community spread.  See generally "News and Media," N.H. Governor Chris Sununu, https://www.governor.nh.gov/news-and-media/?category=Transcripts (containing transcripts of the governor's press conferences regarding the pandemic).

The State also suggests that the "LPNH is able, armed with resources reflecting public support, to gather the . . . necessary signatures" during that period.[44]  But, as Secretary Jarvis explained, the LPNH lost about half of its volunteer petitioners due to the perceived health risks arising from the in-person petitioning process.  Additionally, she noted that the LPNH has had several advertised petitioning gathering contracts that remain outstanding or unfilled, even though the LPNH has funds to pay petitioners at rates exceeding past election cycles.  She further testified that the LPNH is obtaining about 40 signed petitions per day, in contrast to the nearly 40 signed petitions the LPNH typically collected per hour during prior election cycles.  As such, the plaintiffs cannot, as the State appears to suggest, simply retain more paid or unpaid volunteers to meet the nomination signature requirement.  To the contrary, the plaintiffs have shown that even with their increased efforts to hire paid petitioners and increased funds to do so, meeting the signature requirement by the August 5, 2020 deadline would be nearly impossible for their third-party operation.

**Remote signature collection**.  Finally, the plaintiffs have adequately shown that during both the Stay-at-Home and Safer-at-Home periods, efforts to obtain nomination papers by remote means such as telephone, mail, e-mail, and social media have been vastly less effective than in-person means. For example, Libertarian Party candidate for United States Senate Justin O'Donnell testified that during the state-of-emergency, he sent

_____

[44] Defendants' Surreply (doc. no. 21) at 5.  The court assumes that in recognizing the LPNH has resources reflecting public support, the State does not concede that these resources evidence the modicum of support New Hampshire's ballot-access laws seek to ensure before placing candidates on the ballot.  See infra Part III.A.3 (discussing the State's interest in strict enforcement of the ballot-access laws).

mailers with prepaid, return envelopes to 150 Libertarian Party donors—an effort he reported was relatively costly for his small campaign—but received only 7 signed petitions. His emails to between 500 to 1000 known LPNH supporters yielded similar results. Libertarian Party candidate for Governor Darryl Perry reported that he has sought signatures through his social media pages but has received only a handful of signed petitions. While a low return on signatures might suggest a lack of support for the Libertarian Party candidates, these remote solicitation efforts were targeted at historical Libertarian Party supporters. The low return thus suggests, instead, that "during these unprecedented circumstances, the efficacy of a mail-only signature gathering campaign" or other remote means of signature collection is "questionable at best." See Esshaki I, 2020 WL 1910154, at *5 (rejecting the State of Michigan's argument that the plaintiff's burden was not severe because he could have utilized more costly mail-based campaigns as an alternative to in-person petitioning); cf. Libertarian Party of Illinois v. Pritzker, No. 20-cv-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) (noting that, due to the closure of most public places during the pandemic, voters "may have limited access to the Internet or a printer, or may even be wary of opening mailed petitions.").

**The State's arguments**. Despite these showings, the State contends that its ballot-access laws, as applied during the pandemic, impose no undue burden for several reasons.[45] First, it asserts that the plaintiffs "did very little[ ] to collect nomination papers for the first half of 2020," and that in the absence of evidence detailing sufficient efforts to obtain nomination papers during that time, "any burden placed on the plaintiffs' ability to

---

[45] Defendants' Obj. to Mot. for TRO and Prelim. Injunction (doc. no. 9) at 23.

access the ballot due to the COVID-19 pandemic can hardly be considered severe."  The State cites no legal authority applying this proposition in the ballot-access context.  The court thus interprets the argument as one attacking the sufficiency of evidence showing that the plaintiffs' ability to collect signatures has been significantly limited.

The evidence adduced at the preliminary injunction hearing shows that the plaintiffs were not idle during the period before the declared state of emergency.  It is true, as the State observes,[46] that plaintiffs engaged in relatively fewer solicitation activities in January and February.  But it offers no authority for the proposition that candidates must engage in a certain amount of activity during a given timeframe to avoid a burden.  And witnesses testified that, contrary to the State's suggestions, they did collect nomination signatures at polling locations during New Hampshire's presidential primary in February. Secretary Jarvis further testified that the party placed volunteers outside of the polling locations for the purpose of collecting signatures.  Perry testified that he, his wife, and at least one other volunteer collected signatures at the Ward 4 polling location on that day. And though O'Donnell was required to work in his professional position that day, he testified that he knew of other volunteers who attempted to collect signatures in polling locations in Goffstown and at St. Anselm's College.

Though the plaintiffs could have been more active during January and February, they have adequately explained to the court's satisfaction that their decision to concentrate

---

[46] Defendants' Obj. at 17–18.  For example, the State asserts that "if LPNH had only 150 supporters and targeted polling places with higher numbers of voters, each would have had to gather at most twenty signed nominating papers" and that "[i]f LPNH is unable to muster 150 supporters, that may reflect its candidates' level of support and their entitlement to a position on the general election ballot."  Id.

collection activities during the spring and summer was a reasonable one. As the witnesses testified, the LPNH is a third party of limited financial resources; and it determined that, this year, those resources were more efficiently deployed seeking signatures during the spring and summer months. And because the Libertarian Party selects its candidates for President and Vice President at its convention in late May, the candidates for those positions cannot be named on nomination papers until later in the signature-gathering period. The plaintiffs' witnesses each explained that, in past election cycles, pushes to collect signatures after the Libertarian Party convention have been successful.

Through its argument as to the pre-pandemic period, the State essentially "asks the [c]ourt to find that [the plaintiffs] lacked diligence because they forgot to consult their crystal ball and predict a court challenge, a pandemic, and unprecedented societal upheaval." People Not Politicians Oregon v. Clarno, No. 6:20-cv-01053-MC, 2020 WL 3960440, at *5 (D. Or. July 13, 2020). This is not a case where third-party candidates engaged in minimal effort to access the ballot. See, e.g., Libertarian Party of Connecticut v. Merrill, No. 3:20-cv-0467-JCH, 2020 WL 3526922 at *10 (D. Conn. June 27, 2020) (the "very limited experience" of a candidate's 45-minute effort seeking signatures door to door, "is insufficient to persuade the court that in-person petitioning is impossible, particularly in light of the evidence before the court of successful in-person petitioning"). Further, the plaintiffs' constitutional rights to access the ballot access should not be "forfeitable based on a timeline." Idaho v. Little, No. 1:20-cv-00268-BLW, 2020 WL 3490216, at *7 (D. Idaho June 26, 2020) ("The rights exist throughout the duration of the . . . process, whether on the first day or in the last months."). The court instead finds that the plaintiffs submitted sufficient evidence showing that but for the pandemic related

restrictions, their strategy for collecting signatures in January and February was reasonable.

Finally, the State argues that societal conditions created by the COVID-19 pandemic alone, rather than any of the State's actions, imposed any purported burden on the plaintiffs. But as other courts have recently determined, the relevant state action here is the Secretary's enforcement of the numerical requirements for signed nomination papers. See Fair Maps Nevada v. Cegavske, No. 3:20-cv-00271-MMD-WGC, 2020 WL 2798018, at *8 (D. Nev. May 29, 2020). While the pandemic affects the weight of the burden when those requirements are applied to the plaintiffs under these conditions, it is this state action that imposes the burden. See Thompson v. Dewine, 959 F.3d 804, 810 (6th Cir. 2020) (considering the effect of state action in analysis of burden on First Amendment rights); Sinner v. Jaeger, No. 3:20-cv-00076, 2020 WL 3244143, at *4 (D.N.D. June 15, 2020).

"The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." Libertarian Party of Kentucky v. Grimes, 835 F.3d 570, 574 (6th Cir. 2016); see also Merrill, 2020 WL 3526922, at *9 (considering whether "the number of signatures required" during the pandemic was "so high as to virtually exclude a candidate from the ballot"). Had the Governor or the Secretary of State modified their enforcement of the State's election laws in some way during this public health emergency, the plaintiffs' claim of burden would have much less force. See, e.g., Hawkins v. DeWine, No. 2:20-cv-2781, 2020 WL 3448228, at *5 (S.D. Ohio June 24, 2020) (exempting activities pertaining to "First Amendment protected speech" from Ohio's stay-at-home orders); Gottlieb v. Lamont, No. 3:20-cv-0623 (JCH), 2020 WL 3046205, at *5 (D. Conn. June 8, 2020)

(denying preliminary injunction, in part, because the governor in an emergency order reduced the number of signature by 30% and extended deadlines by two days). That is not the case here.

The court finds that the effect on public gatherings and in-person signature collecting imposed by the Stay-at-Home and Safer-at-Home Orders, combined with strict enforcement of New Hampshire's ballot-access signature requirements, imposes a substantial burden, but not a severe one, for "new party and independent candidates attempting to have their names placed on the general election ballot." Cf. Pritzker, 2020 WL 1951687, at *4. Under normal circumstances, the plaintiffs would have nearly seven months to gather signatures and submit nomination papers of either 1,500 or 3,000 registered voters to secure a place on the ballot. The Stay-at-Home period effectively prevented the plaintiffs from soliciting signatures in-person for more than two and a half months. The transition to Safer-at-Home now permits the plaintiffs to engage in in-person solicitation activities, albeit with relatively reduced success, as evidenced by the LPNH's historical ability to obtain petitions during a similar period.

Given these factors, and the plaintiffs' ability to collect at least some petitions before the state of emergency began, the court cannot say that the plaintiffs have been excluded or virtually excluded from the ballot. "Strict scrutiny" thus does not apply. But the plaintiffs have carried their burden of demonstrating that they are subject to a burden—albeit a lesser one—on their access to the ballot.

**3.      The State's interest**

The court's conclusion that strict enforcement of New Hampshire's ballot-access laws, as applied during the COVID-19 pandemic, imposes a burden on the plaintiffs' First

and Fourteenth Amendment rights to access the ballot does not end the analysis. Under Anderson, the court must still consider the "precise interests put forward by the State as justifications for the burden imposed by" the enforcement of the ballot-access laws, 460 U.S. at 789, and determine whether those interests are "sufficiently weighty to justify the limitation," Norman, 502 U.S. at 289. It does so without applying any specific or discrete level of scrutiny. See supra Part II.A.1 (discussing the Supreme Court's preference of "avoid[ing] preset levels of scrutiny in favor of a sliding-scale balancing analysis").

"Only regulations that are both supported by compelling state interests and that do not unreasonably restrict ballot access are permissible." Acosta, 2020 WL 3495777, at *4 (citing Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184 (1979)). "The burden is on the government to articulate a compelling state interest and manner by which the state pursues that interest." Id. In its memorandum, the State identifies an "interest in ensuring that a candidate makes a preliminary showing of a substantial measure of support as a prerequisite to appearing on the ballot."[47] See also Jenness v. Fortson, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot . . . ."). As the State points out, the legitimacy of such an interest is "settled beyond hope of contradiction." Barr, 626 F.3d at 111.

"[W]hile the [c]ourt recognizes the important state interest of ensuring a candidate has a significant modicum of support before appearing on the ballot," this interest does not

---

[47] Defendants' Obj. at 24 (quoting Barr, 626 F.3d at 111) (internal quotation marks omitted).

outweigh the plaintiffs' "increased burden in light of the constraints presented by the COVID-19 pandemic." Cooper v. Raffensperger, No. 1:20-cv-01312-ELR, 2020 WL 3892454, at *8 (N.D. Ga. July 9, 2020). In enacting New Hampshire's ballot-access laws, the New Hampshire legislature granted candidates for public office nearly seven months to gather and collect a set number of nomination papers—1,500 for Congressional candidates and 3,000 for presidential candidates— as a preliminary showing of support that would justify printing the name of a candidate on the ballot. The plaintiffs were deprived of a significant portion of this time, as well as the typical means of collecting signatures, while the State's Stay-at-Home Orders were in effect. The State has not demonstrated or explained how an artificial shortening of the petition-gathering window, enforced through the State's reasonable response to an unanticipated global pandemic, furthers the State's identified interest of avoiding ballot clutter. Rather, it appears that strict enforcement of the State's normally reasonable ballot-access laws during this pandemic-influenced election cycle will unduly prevent the plaintiffs, who have had enough support to appear regularly on the ballot in the past, from appearing on the general-election ballot.

The State relies on a handful of decisions in which courts, considering the application of ballot-access and ballot-initiative laws during the pandemic, found that the State's interests outweighed the burdens imposed on the plaintiffs. The evidence in this case distinguishes it from those cited by the State.

In one line of cases, states had already made pandemic-related accommodations for potential candidates. In Merrill, for example, the court denied a preliminary request to enjoin enforcement of Connecticut's ballot-access statutes against certain third-party

candidates.  2020 WL 3526922.  Similar to New Hampshire's, Connecticut's statutes required that candidates gather approximately 7,800 or 2,800 signatures (depending on the office sought) between January 2 and August 5.  Connecticut's governor also issued stay-at-home orders in March.  But, unlike here, Connecticut had reduced the signature requirement by 30%, extended the filing deadline by a few days, and eliminated the in-person signature requirement, all before the plaintiffs moved for preliminary injunctive relief.  Id. at *11.  The court found that these accommodations lessened the burden on the plaintiffs, and the plaintiffs had adduced "very little evidence based on the actual experiences of its candidates during the current election cycle" to show that the ballot-access requirements, as reduced by the state's accommodations, unduly burdened the plaintiffs' rights.  Id.  This case is different in both respects.

In the second line of cases, other courts denied preliminary injunctive relief where the stay-at-home period constituted "[i]n context, a short window where in-person solicitation may not have been permitted" and thus did not impose "a severe burden."  See Common Sense Party v. Padilla, No. 2:20-cv-01091, 2020 WL 3491041 (E.D. Calif. June 26, 2020; Fagin v. Hughs, No. SA-20-cv-00765-XR, 2020 WL 4043753, at *4 (W.D. Tex. July 17, 2020) (denying preliminary injunctive relief where San Antonio's stay-at-home order was in effect for less than two weeks).  In Padilla, for example, the court held that a California requirement for a new party to obtain 68,180 signatures over nearly a year-long period did not impose a severe burden on ballot access when the stay-at-home period lasted two months.  Id. at *3. Notably, the plaintiffs in Padilla shared an underlying characteristic with the plaintiffs in Merrill:  the court found, they "essentially abandoned most of their efforts once they ceased utilizing in-person solicitations at the beginning of

March." Id. at *6.  Additionally, the court found that "it [was] unclear what efforts

Plaintiffs have undertaken to try to continue to collect registrations." Id.  As discussed

above, the record differs starkly in this case; the evidence here demonstrates the plaintiffs'

continued efforts to obtain signatures by various means despite the pandemic's effects on

in-person solicitation.  See supra Parts I.E, II.A2.

The State's interest in avoiding ballot clutter and its chosen means of preserving

that interest do not justify the burden that enforcing the ballot-access law places on the

plaintiffs during the pandemic-infused 2020 election cycle.  Accordingly, the court finds

the plaintiffs have shown a likelihood of success on the merits of their First and

Fourteenth Amendment claim.

## B.    Irreparable Harm

Plaintiffs seeking a preliminary injunction must demonstrate an imminent risk of

irreparable harm.  Ross-Simons, 217 F.3d at 13.  "The burden of demonstrating that a

denial of interim relief is likely to cause irreparable harm rests squarely upon the movant."

González-Droz, 573 F.3d at 79.  To meet this burden, the Libertarian Party and its plaintiff

candidates must provide "something more than conjecture, surmise, or a party's

unsubstantiated fears of what the future may have in store."  Charlesbank Equity Fund II

v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  But the burden is not heavy in

this case.  As the State acknowledges,[48] "[i]n the First Amendment context, the likelihood

of success on the merits is the linchpin of the preliminary injunction analysis."  Sindicato

Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012).  "The loss of

_____

[48] Defendants' Obj. at 25.

First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id. at 10-11 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). Here, the harm the plaintiffs plead is their absence on a ballot and, thus, loss of their First Amendment right to participate in the electoral process. The State does not dispute that this absence would irreparably harm the plaintiffs.[49]

It argues, instead, that the harm is not imminent because the plaintiffs had and still have sufficient opportunity to gather the requisite number of signatures between the expiration of the Stay-at-Home Orders and the August 5 deadline.[50] And perhaps that would be true, under normal conditions. But, as explained supra Parts I.E, II.A.2, even though the Stay-at-Home Orders have lifted, the plaintiffs are not operating under normal conditions.[51] The evidence in this case demonstrates that even reasonable precautions to prevent the community spread of COVID-19, such as those advised by the Safer-at-Home Order, have prevented the plaintiffs from obtaining signatures at the same rate as they have in previous years.[52] The plaintiffs thus have demonstrated that, in light of the State's Stay-at-Home and Safer-at-Home Orders' restrictions and the strongly recommended culture of social distancing that persists, they will be unable to gather the requisite number of nominating papers by the August 5, 2020 deadline, even though they may have sufficient support in the State.

---

[49] Defendants' Obj. at 25–27.

[50] Defendants' Obj. at 25–26.

[51] As described supra Part II.A.2 & n.43, the Governor has acknowledged as much.

[52] As also explained supra Part II.A.2, the disparity in responses, especially those from mailings targeting known Libertarian Party supporters, suggests that the LPNH's collection rate this year is attributable to these conditions, rather than a lack support.

The State also argues that the plaintiffs, having inflicted the alleged harm on themselves, are thus unable to demonstrate that it would be irreparable. See Fibs Leasing Co. v. Airdyne Industries, Inc., 826 F. Supp. 38, 39 (D. Mass. 1993) (Gorton, J.) (citing San Francisco Real Estate v. Real Estate Invest. Trust of Am., 692 F.2d 814, 818 (1st Cir. 1982)). Specifically, it argues that the plaintiffs inflicted the harm on themselves by failing to undertake sufficient signature-collection activity in the first quarter of 2020, before the Stay-at-Home Order went into effect, and after the Stay-at-Home Order expired.[53] But, as also discussed supra Parts I.E, II.A.2, the plaintiffs have explained their decision to focus their signature-collection activities during the spring and summer months. And the court is disinclined to penalize them for failing to predict that a global pandemic would interrupt those plans, especially in light of the evidence of their efforts to gather signatures by other means and their drive to collect signatures despite social-distancing guidelines after the Stay-at-Home Orders lifted. The plaintiffs' harm is thus not self-inflicted to a degree that would warrant a denial of preliminary relief despite their showing of likelihood of success on the merits.

## C. Balance of the equities

Neither side focuses heavily on the balance of equities. The plaintiffs argue that, having "demonstrated through numerous election cycles that under normal circumstances they would have the capability and determination to secure the necessary nomination signatures," it would be unfair to deny them access to the general-election ballot under

---

[53] Defendants' Obj. at 26–27.

44

conditions occasioned by the COVID-19 pandemic and the State's response to it.[54]  The State counters that the equities weigh against the plaintiffs because they procrastinated and contributed to their own harm.[55]

As explained <u>supra</u> Part III.A.2, however, the plaintiffs reasonably explained their decision to focus their signature-collection activities in the spring and summer months; procured signatures during the February presidential primary; and have made efforts to do so remotely during the Stay-at-Home Orders and in-person during the Safer-at-Home period, despite cancellation of public gatherings and other events outside of their control. Because "equity aids the vigilant," and the plaintiffs did not "slumber on their rights," the balance of equities favors injunctive relief.

At the same time, a less-restrictive ballot-access requirement, such as a reasonable reduction in the number of signatures required given the ongoing pandemic, will not unduly hinder the State's interest in ensuring that the Libertarian Party candidates demonstrate the "modicum of support" to justify placement on the general-election ballot.

## D.    The public interest

Neither side focuses heavily on the public interests in play, either.  The plaintiffs invoke the public's interest in giving New Hampshire voters a variety of candidates and viewpoints to choose from during the general election.[56]  The State, on the other hand, contends that the public has an interest in ensuring that candidates have "a significant modicum of support before appearing on the ballot," and that permitting candidates to

---

[54] Plaintiffs' Mem. at 5.

[55] Defendants' Obj. at 27–28.

[56] Plaintiffs' Mot. (doc. no. 4) at 5.

45

appear on the ballot without demonstrating the full support required by law "would frustrate the will of the electorate . . . ."[57]

The court need not focus heavily on this element, either. Though the parties both raise important points, "[w]hen a constitutional violation is likely," which the court has found here, "the public interest militates in favor of injunctive relief because it is always in the public interest to prevent violation of a party's constitutional rights." ACLU Fund of Mich. v. Livingston Cnty., 796 F.3d 636, 649 (6th Cir. 2015). And requiring the plaintiffs to engage in the efforts necessary to obtain the full number of "[i]n-person signatures amid a pandemic, one comprised of a highly contagious virus transmitted through close human contact, actually would undermine the public interest." Acosta, 2020 WL 3495777, at *5. The plaintiffs have therefore demonstrated that the public interest favors injunctive relief in this case.

## E.    Remedy

Finding that the plaintiffs are entitled to preliminary injunctive relief, the court now turns to fashioning that relief. The plaintiffs seek two forms of relief, both of which entail enjoining the State from enforcing the full statutory nomination paper requirements of N.H. Rev. Stat. Ann. § 655:42 against them. Specifically, the plaintiffs ask the court either to (1) require the Secretary of State to place the Libertarian Party's candidates on the 2020 general election ballot without submitting nomination papers,[58] or (2) reduce the number of nomination papers required by a given percentage—they sought a 90% reduction in

---

[57] Gov't Obj. at 27.

[58] See Plaintiffs' Mem. at 6.

their complaint[59] and, in later briefing, argued for a 40% or 50% reduction.[60] At the preliminary injunction hearing, the court and the parties discussed two more potential avenues of relief that, the evidence suggested, may lessen the burden on the plaintiffs: (1) permitting voters to sign nomination papers using an electronic signature and (2) extending the deadline for the submission of nominating papers to the supervisors of the checklist.

The court declines to require that the plaintiffs be automatically placed on the ballot, as the plaintiffs would prefer. Although the full requirement imposes a burden under present conditions which outweighs the State's interests, those interests remain relevant and justify reducing, rather than eliminating, the requirement. See Munro, 479 U.S. at 197 (noting that states need not provide automatic ballot access). "Even in the midst of the pandemic, the State has a legitimate interest in ensuring that a candidate makes a preliminary showing of support among the electorate before appearing on the ballot." Goldstein, 142 N.E.3d at 572. And the "pandemic has not completely deprived candidates of the ability to gather signatures." Id. While the plaintiffs have demonstrated that the requirement to gather a certain number of nomination papers under the current conditions imposes a substantial burden on them, they have not shown that it is impossible. The court therefore "must balance these difficulties with the need to honor the State's legitimate interest in ensuring that only candidates with a measurable modicum of public support will gain access to the 2020 general election ballot." Cooper, 2020 WL 3892454, at *9.

_____

[59] Amended Compl. (doc. no. 2) at 7.

[60] Plaintiffs' Reply at 14–15; Plaintiffs' Proposed Order (doc. no. 23) at 3.

Nor will the court require a change in the type of signatures required. The plaintiffs did not request such relief before the hearing and, at the hearing, argued that permitting electronic signatures would have little ameliorative effect. Such remedy could interfere with the usual procedures for certifying nomination papers and pose other administrative questions. See Fair Maps, 2020 WL 2798018, at *16 (altering in-person signature requirements for ballot initiative would "get impermissibly in the weeds of designing election procedures"); Constitution Party, 2020 WL 4001087, at *7 n.6; Goldstein, 142 N.E.3d 560, 574. As to an extension of deadlines, while the State initially advised the court that a brief extension might be possible—without waiving or forfeiting its overall objection to any remedy—it later identified difficulties ultimately driven by its federal statutory obligation to distribute ballots to military and overseas voters. See 52 U.S.C. § 20302(a)(8)(A).

The court thus follows the simplest and easily administrable course and orders the Secretary of State to reduce the number of signatures required of the Libertarian Party candidates for each position by 35%. This accounts for the plaintiffs' inability to acquire signatures in person during the State's Stay-at-Home Orders and residual effect of the social distancing guidelines that remain in the Orders' wake, which prevent the plaintiffs from making up for time lost during the Stay-at-Home period.

This year, the plaintiffs had a total of 217 days between January 1 and August 5 to obtain the necessary nominating papers. The Stay-at-Home Orders were in effect for 80 of those days, or approximately 37% of the available collection period. This provides a rough guideline for the appropriate reduction. See Goldstein, 142 N.E.3d at 572 (using percentage of signature-gathering period impacted by stay-at-home restrictions as guide

for reducing signature requirement); Garbett, 2020 WL 2064101, at *18 (same).  And the evidence supports it.  The plaintiffs' witnesses consistently testified, as explained in detail supra, that they expected to obtain signatures in person; that they were unable to do so effectively during the Stay-at-Home period; and that their efforts to obtain signatures by other means during that period, even when targeting known supporters, were unsuccessful.  The evidence further shows that their signature-gathering efforts remain hampered by social distancing guidelines that are not only reasonable, but encouraged by the State and its governor.

This 35% reduction in the nomination-paper requirement means that the Libertarian Party's candidates for President, United States Senator, and Governor of New Hampshire must submit nomination papers signed by 1,950 registered voters, including 975 from each of New Hampshire's congressional districts; its candidates for United States Representative must submit 975 nomination papers signed by registered voters from that district; and its candidates for state representative or county office must submit 97 nomination papers.

Some courts have expressed reluctance to order a state to undertake specific remedies involving its election laws.[61]  See Esshaki II, 2020 WL 2185553, at *1-2 (affirming injunction but staying specific remedy on constitutional grounds); Reclaim Idaho v. Little, No. 20-cv-268-BLW, 2020 WL 3490216, at *11 (D. Idaho June 26, 2020) (though court was "disinclined to tell the State how to run the initiative process," it placed restrictions consistent with First and Fourteenth Amendments); Clarno, 2020 WL

---

[61] The State here has not argued that relief in this form would be unconstitutional; it argues only that relief is not warranted.  See generally Defendants' Obj.; Defendants' Surreply.

3960440, at *7 (same).  And, "[t]o some extent, a degree of arbitrariness creeps into selecting a deadline for completion of any task, or picking a numerical standard for successful completion of a task."  Constitution Party, 2020 WL 4001087, at *7 n.6.  But "the requirements imposed today roughly balance the plaintiffs' need to support their candidates with the [State's] need to have a fair and honest election." Id.

## III.  Conclusion

The plaintiffs have demonstrated a likelihood of success in demonstrating that the burden on their rights to access the 2020 general-election ballot in New Hampshire outweighs the State's interest in strictly enforcing the challenged state election laws as applied under the conditions of the COVID-19 pandemic.  They have also demonstrated irreparable harm, that an injunction would serve the public interest, and that the balance of equities favors relief.  Accordingly, the court GRANTS the plaintiffs' motion for a preliminary injunction,[62] and orders a 35% reduction of the number of nomination papers required for the Libertarian Party's candidates to appear on the general-election ballot.


**SO ORDERED**.


_____
Joseph N. Laplante
United States District Judge


Dated:  July 28, 2020


_____
[62] Doc. no. 4.

50

cc: H. Jonathan Meyer, Esq.
   Daniel E. Will, Esq.
   Laura E. B. Lombardi, Esq.
   Sean R. Locke, Esq.